PHILIPS MEDICAL SYSTEMS
INTERNATIONAL B.V., et
al., Plaintiffs–Appellees,

v.

Martin E. BRUETMAN, et al.,
Defendants–Appellants.

Nos. 92–3155, 93–1308 and 93–1901.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 13, 1993.

Decided Nov. 1, 1993.

Rehearing Denied Jan. 10, 1994.

Robert J. Rubin, Darren B. Watts (argued), David A. Cerda, Altheimer & Gray, Chicago, IL, for plaintiffs-appellees.

James A. McGurk, Dennis A. Bell, Bell & McGurk, Donald L. Metzger (argued), Metzger & Associates, Chicago, IL, Howard A. Shalowitz, St. Louis, MO, for defendants-appellants.

Before POSNER, Chief Judge, and CUDAHY and KANNE, Circuit Judges.

POSNER, Chief Judge.

These appeals arise out of a $19 million default judgment against Dr. Martin Bruetman and several corporations that he controls. The judgment itself was before us in *Philips Medical Systems International, B.V. v. Bruetman*, 982 F.2d 211 (7th Cir.1992), and the interested reader is referred to that opinion for the details leading up to its entry; we shall simplify a lot to keep this opinion to a manageable length. A physician of U.S. citizenship but Argentine origin who divides his time between the United States and Argentina, Bruetman is engaged through his corporations in the supply of high-tech medical equipment to clinics and other medical facilities in South America. In 1991, Philips, a Dutch manufacturer of such equipment, brought this suit, claiming that Bruetman, in violation of the RICO statute, had used his corporations to defraud Philips by obtaining equipment from it on the basis of a false promise to pay for the equipment. On February 18, 1992, the district judge entered a default judgment against all the defendants because of Bruetman's refusal to cooperate in discovery and his other contumacious behavior, reviewed in our previous opinion. We affirmed the judgment. But noting that Bruetman had flown to Argentina on February 17, 1992 (precipitating the default judgment), and had remained there ever since, we said that "Bruetman is free to avoid the present contempt and default judgments ... by returning to the United States within thirty days from now for the continuation of the deposition and compliance with the district court's orders." 982 F.2d at 215. He would have to "cooperate fully" in discovery. *Id.* at 212.

Bruetman returned, responded to a document request by Philips that was pending, and asked the district court to vacate the default judgment. The court refused, primarily because Bruetman had not complied with an order the court had entered, in the course of proceedings to enforce the default judgment, requiring him to deposit in the court the proceeds (more than $800,000) from a sale of Philips equipment that he or one of his corporations had made to a clinic in Chile. The court added that "Dr. Bruetman's chaotic eleventh hour in court document production and its concomitant confusion" had "violated the spirit, if not the substance, of the Seventh Circuit's order that Dr. Bruetman return within 30 days and cooperate fully." Bruetman argues, in the main appeal before us, that the district court abused its discretion by refusing to vacate the default judgment.

■ A default judgment is the mirror image of a dismissal of a suit for failure to prosecute, a ground of dismissal that we discussed at length in *Ball v. City of Chicago*, 2 F.3d 752 (7th Cir.1993). Default is failure to defend; failure to prosecute is a plaintiff's default; both a default judgment and a dismissal for failure to prosecute are sanctions for disruptive or dilatory conduct in litigation. The standard for whether to impose them should, therefore, be the same, and a comparison of decisions articulating the standard for the entry of a default judgment with the standard set forth in *Ball* for dismissals for failure to prosecute indicates that they are the same. *Crown Life Ins. Co. v. Craig*, 995 F.2d 1376, 1381–82 (7th Cir.1993); *Profile Gear Corp. v. Foundry Allied Industries, Inc.*, 937 F.2d 351, 353–54 (7th Cir.1991). The standards are explicitly merged in *Beeson v. Smith*, 893 F.2d 930, 931 (7th Cir. 1990), and *Anchorage Associates v. Virgin Island Bd. of Tax Review*, 922 F.2d 168, 177 (3d Cir.1990), although *Buck v. Dept. of Agriculture*, 960 F.2d 603, 607 (6th Cir.1992), suggests a qualification: since a default judgment tends to be entered earlier in a litigation than a dismissal for want of prosecution, particular care must be taken that the judge does not, in the former case, jump the gun. Nevertheless the standards for the two sorts of sanctioning terminations are very close.

Since dismissals for failure to prosecute and judgments of default are sanctions, they must be analyzed as such. Notice is important, and sanctioning the right party is important—but there was plenty of notice here, and the right party is Bruetman; this is not a case of the lawyer's mistakes being visited on the client. Since sanctions should be pro-

portionate to wrongdoing, the district judge should compare the size of the default judgment, discounted by the probability of collection, with the gravity of the defendant's procedural lapses or other misconduct, in deciding whether to enter such a judgment. A $19 *million* dollar default judgment must therefore give pause, just as a $19 million dollar fine would give pause. The figure exaggerates the realistic size of the sanction, as it is most unlikely that the assets of Dr. Bruetman and the corporations he controls come close to $19 million; and Bruetman's behavior was egregious. Yet the panel that decided the previous appeal was sufficiently impressed by the magnitude of the judgment to rule that Bruetman must be given a second chance, upon certain conditions.

Still, the court affirmed the default judgment without modification. The most sensible interpretation of the affirmance and accompanying opinion, we believe (no member of this panel was a member of the earlier one), is that in an effort (futile, as it turned out) to head off further litigation, the panel was laying down guidelines for the district court's consideration of a motion under Fed. R.Civ.P. 60(b), should one be filed, to vacate the default judgment. See also Fed.R.Civ.P. 55(c). Finality is an important value in a procedural system, and therefore a litigant who seeks to set aside a final judgment has a heavy burden; among other things he must establish that he has a meritorious defense to the suit. *Connecticut National Mortgage Co. v. Brandstatter*, 897 F.2d 883, 885 (7th Cir.1990); *Rutland Transit Co. v. Chicago Tunnel Terminal Co.*, 233 F.2d 655, 657 (7th Cir.1956); 10 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2697 (2d ed. 1983). In recognition of the unusual (although not unprecedented, *Hughes Tool Co. v. Trans World Airlines, Inc.*, 409 U.S. 363, 93 S.Ct. 647, 34 L.Ed.2d 577 (1973); *Islamic Republic of Iran v. Boeing Co.*, 739 F.2d 464, 465 (9th Cir.1984) (per curiam), and, as we have suggested, possibly illusory) magnitude of the default judgment in this case, the panel in effect excused Bruetman from having to meet the ordinary test for vacating such a judgment, requiring him only to return to the United States, comply with the orders outstanding against him, and cooperate—fully—in the further conduct of the litigation: not also show that he has a meritorious defense.

▇▇▇ The previous panel's opinion can be criticized for substituting for the established standard governing motions to vacate default judgments an uncanalized, even a lawless, discretion—or commended for flexibility, lenity, and ingenuity. That is neither here nor there. The opinion established the law to govern the further proceedings in this case. *Williams v. Commissioner*, 1 F.3d 502, 504 (7th Cir.1993). Granted, we are not to regard the previous opinion as a straitjacket; the doctrine of the law of the case does not forbid us to correct demonstrable errors. *Brazinski v. Amoco Petroleum Additives Co.*, 6 F.3d 1176 (7th Cir.1993). So we must consider Bruetman's argument that the previous opinion contains a critical error induced by a misrepresentation that Philips's lawyer made to the panel. After noting the district court's order that Bruetman deposit in court the $800,000 in proceeds, and his failure to do so, the panel remarks that the district court had cited him for contempt, 982 F.2d at 214; and that is true—but the district court had vacated the contempt citation a couple of weeks later, a fact omitted in Philips's brief. The omission, however, while censurable, was not material, which may be why Bruetman did not move the panel to correct its opinion, as he easily could have done. The district court withdrew the citation for contempt but not the order on which it was based, and this court made it a condition of its lenient treatment of Bruetman that he comply with the district court's orders. And anyway the district court later reinstated the contempt citation, deciding that it had vacated it on the basis of incomplete information.

▇▇▇ Bruetman did not comply with the order to deposit the proceeds. Instead, when the issue arose on remand, he reminded the district court of an "affidavit" he had filed months earlier, explaining that the entire proceeds had either been paid or committed to be paid, leaving nothing to deposit in court. The district court was not impressed. The "affidavit," not being signed under oath, was no such thing; and the

details of the "commitments," including some $400,000 promised to Bruetman's Argentine lawyer, were not set forth. A further reason not to be impressed by Bruetman's defense of "impossibility" is that, as the district judge remarked, money is fungible and if the asset that had been ordered to be deposited in court had been dissipated, an equivalent asset could be substituted. Of course it is possible not only that the proceeds were entirely committed or paid out but also that Bruetman cannot replace them. But neither possibility has been satisfactorily demonstrated and in particular it has not been shown that Bruetman could not have complied with the order at least in part.

The order had specified *the proceeds*, not any old cash; so Bruetman argues that as soon as he checked them out of his bank account the order to deposit them in the district court lapsed. Reliance on so technical and indeed nonsensical a distinction (for the money he received would have lost its separate identity as soon as it was deposited in his bank account) is wholly out of keeping with the spirit of the remand. Bruetman was given one last chance to demonstrate good faith. Trying to crawl through a loophole in the district judge's order demonstrated the opposite.

■ He has another string to his bow. He argues that the order to deposit the $800,000 in court was invalid because issued before the default judgment became a final, appealable judgment; a counterclaim by one of the defendants remained to be disposed of. Philips argues that the order was appealable when issued, and therefore Bruetman waited too long to appeal it and challenge its invalidity. *That* argument is incorrect. *Uehlein v. Jackson National Life Ins. Co.*, 794 F.2d 300, 301 (7th Cir.1986). And Bruetman may well be right that under Illinois law, which governs the postjudgment proceedings in this case, *Resolution Trust Corp. v. Ruggiero*, 994 F.2d 1221, 1226 (7th Cir.1993), proceedings to collect a judgment cannot begin until the judgment has become final. *In re Wey*, 827 F.2d 140, 141–42 (7th Cir.1987); *General Telephone Co. v. Robinson*, 545 F.Supp. 788, 791–92 (C.D.Ill.1982). But this is irrelevant. A federal court is empowered to issue all orders necessary and proper to protect the enforceability of a judgment before it becomes final, provided only that the forum state equips its own courts with such remedies, Fed.R.Civ.P. 64; *Lechman v. Ashkenazy Enterprises, Inc.*, 712 F.2d 327, 330 (7th Cir.1983) (per curiam), and Illinois does. 735 ILCS 5/4–101 (1992). That power provided an adequate foundation for the order to deposit in court, where they would be available to satisfy the judgment in part should it be affirmed (as it later was), the proceeds of the sale of Philips equipment to the Chilean clinic.

The same power supported, though less firmly, the district court's order, also challenged by Bruetman, directing one of the corporate defendants to deposit in the court certain bills of exchange that it had received from the sale of medical equipment bought from Philips. These bills are currently held in an Argentine court in which Philips has brought a parallel suit against Bruetman and his corporations. Bruetman objects to the order on the ground that it enjoins a foreign litigation, in violation of international comity. The order does not run against any Argentine court or official (cf. 28 U.S.C. § 2283), but it could deeply affect the Argentine suit, as the only way Bruetman can wrest the bills of exchange free from the grip of the Argentine court, and thus comply with Judge Duff's order, is by abandoning the defense of the Argentine suit.

■ Comity—the respect that sovereign nations (or quasi-sovereigns such as the states of the United States) owe each other— is a traditional, although in the nature of things a rather vague, consideration in the exercise of equitable discretion. It is for example the basis of the doctrine of *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), which (to oversimplify) forbids a federal court in a civil rights case to enjoin a state from prosecuting the plaintiff for criminal violations of the state's laws. An injunction that has the effect of dictating the outcome of a suit in an Argentine court could conceivably though improbably ruffle relations between the United States and Argentina. Fear of that consequence has led some courts to withhold injunctive relief in such

cases unless necessary to head off an "irreparable miscarriage of justice," *Laker Airways Ltd. v. Sabena*, 731 F.2d 909, 927 (D.C.Cir. 1984), while other courts are content with a lesser showing of a need for the relief, e.g., *Seattle Totems Hockey Club, Inc. v. National Hockey League*, 652 F.2d 852, 855–56 (9th Cir.1981)—perhaps nothing more than a duplication of the parties and the issues, see *Gau Shan Co. v. Bankers Trust Co.*, 956 F.2d 1349, 1353–54 (6th Cir.1992), the sort of thing that might suffice where "respect for a co-equal sovereign's jurisdiction is not implicated." *Laker Airways Ltd. v. Sabena, supra*, 731 F.2d at 927 n. 49. Our only decision applied the laxer standard, *Sperry Rand Corp. v. Sunbeam Corp.*, 285 F.2d 542, 545 (7th Cir.1960); and although that was many years ago and a recent decision cited *Laker Airways* approvingly, *Ingersoll Milling Machine Co. v. Granger*, 833 F.2d 680, 684 (7th Cir.1987), the citation was unaccompanied by a discussion of the issue.

We incline toward the laxer standard, though we need not make a definitive choice in this case, or consider a compromise (the effect on a foreign sovereign's jurisdiction is one more factor to be considered in the grant or denial of equitable relief, but is entitled to no fixed weight in that consideration), or even decide whether the differences between the standards are more than verbal, that is, whether they ever dictate different outcomes. This increasingly is one world and we have difficulty seeing why the usual and by no means stringent rules for limiting duplicative litigation should stop at international boundaries. If Argentina actually cares that Bruetman is unable to defend against Philips's suit in an Argentine court we should expect to hear from either our State Department or the foreign office of Argentina, and having heard from neither we are skeptical that the district judge's injunction has jeopardized amicable relations between the two countries. But even under the more demanding standard, Bruetman loses, because Philips has a judgment against Bruetman and his corporations which, we assume, it can plead as res judicata in the Argentine court, thus defeating Bruetman's defense in the foreign sovereign's own courts. *Laker Airways v. Sabena, supra*, 731 F.2d at 926–27.

We say "assume" advisedly, as there is no uniformity in the practice of foreign nations with regard to the recognition of judgments (especially default judgments) of other nations, 1 *Restatement (Third) of the Foreign Relations Law of the United States* § 481 at pp. 601–03 (1987), and we do not know what the practice of Argentina is. But the burden was on Bruetman to establish that the order Judge Duff issued directing Bruetman and his corporations to bring the bills of exchange back to Chicago does not merely protect a judgment that the Argentine courts would respect. Bruetman has not shouldered that burden.

■ So here was another order of Judge Duff's that Bruetman flouted, even though we had ordered Bruetman as a condition of mercy to obey all the orders that the judge had entered. And he failed to cooperate fully in discovery, as we shall shortly see. The question before us, we remind the reader, is not whether the default judgment entered back in February 1992 was precipitate or unduly harsh; it is whether the district court abused its discretion in ruling that Bruetman had failed to satisfy the conditions that this court, in a gesture of extraordinary lenity, had laid down for relief from the judgment. The circumstances that we have recited show that there was no abuse.

■ We turn to the other appeals. The first is the disqualification of two of Bruetman's lawyers. The appeal is properly before us because, although an order of disqualification is a nonappealable interlocutory order, *Richardson–Merrell Inc. v. Koller*, 472 U.S. 424, 105 S.Ct. 2757, 86 L.Ed.2d 340 (1985); *In re Sandahl*, 980 F.2d 1118, 1119 (7th Cir.1992), like other interlocutory orders it is appealable when the case is finally wound up in the district court. This case has been. The judge's order refusing to vacate the default judgment completed the proceedings in the district court.

■ We do not know whether Bruetman actually wants these lawyers back or that they would be willing to work for him again, with increasingly faint prospects of remuneration. But we cannot say that the issue of disqualification is moot. This is not, howev-

er, because the default judgment runs against Bruetman's corporations as well as against Bruetman himself and that with respect to the corporations it is based in part on their failure to enter an appearance, a failure that may be related to the fact that their lawyers had been expelled from the case several months previously. For as we have said already, the validity of the default judgment is not before us, but was resolved in our previous decision. But because Bruetman is deeply involved in litigation in Argentina and may become involved in proceedings in this country to collect the default judgment, we think the eligibility of the two lawyers to assist him and his corporations cannot be regarded as a merely academic question.

■ The district judge disqualified the two on his own initiative when he discovered that they were representing Bruetman's corporations as well as Bruetman himself and that the latter had been acting without specific authorization from the corporations. The judge was concerned that Bruetman and the corporations might have adverse interests. This was a valid concern, see Rule 1.7 of the Rules of Professional Conduct for the Northern District of Illinois (1991), but disqualifying the lawyers on the spot was an invalid response to it. No determination of an actual conflict of interest was ever made; so far as appears, the corporations have no interests separate from Bruetman, who controls them and appears to own most of their stock. And even if they do have distinct, even adverse, interests, the minority shareholders might prefer dual representation to the expense and delay of going out and hiring a lawyer who would have to bring himself up to speed on what already by the time of the disqualification had become a complexly ramified series of proceedings in two countries. The rule disqualifying a lawyer from representing clients with adverse interests is waivable by the clients. Rule 1.7(a)(2). The judge should have held a hearing to determine whether there were adverse interests and if so whether the clients wanted dual representation anyway.

■ The judge also imposed sanctions on two of Bruetman's lawyers for their temerity in filing a second emergency motion to reconsider the default judgment (this was before it was appealed) on the basis of new evidence. Bruetman had as we said flown from Chicago to Argentina on February 17, 1992, interrupting his deposition. Seeking evidence that his "flight" was permanent, Philips's lawyers, impersonating potential buyers of Bruetman's apartment, which he had listed for sale, inspected the apartment the very next day and informed Judge Duff—in the form of an affidavit supporting Philips's motion for the issuance of an ex parte order attaching the contents of the apartment—that there were boxes all over the floor and that the real estate agents had told the lawyers that Bruetman was in the process of shipping valuable antiques and precious objets d'art to Argentina. On the same day that the motion for attachment was filed, the judge both granted it and entered the default judgment.

By misrepresenting their identity to the real estate agents, by making themselves witnesses, and by using their own evidence as a basis for urging the entry of an order—thus hopelessly confounding the role of witness (supposed to be disinterested) and lawyer (supposed to give the evidence a partisan slant)—Philips's lawyers stepped out of their role and may well have committed professional misconduct (for which however they were never sanctioned). See Rules 3.7, 4.1, 4.3, and 4.4 of the Rules of Professional Conduct for the Northern District of Illinois (1991). However that may be, after the default judgment was entered on February 18, Bruetman's lawyers obtained from the real estate agents affidavits that contradicted those of the lawyers at every point. These affidavits, along with portions of Bruetman's deposition, were the evidentiary basis upon which Bruetman sought in his second emergency motion to vacate the judgment. The first motion had been filed on February 25, before the affidavits had been obtained (although one of them is dated that day). The second motion was filed on March 11. The district judge imposed sanctions mainly because the deposition evidence had been available to Bruetman's lawyers at the time of the first motion and therefore could not be considered new evidence. This is true, although the lawyers had not known it because Bruet-

man had failed to pay for the deposition; it was available but not in hand. The affidavits were new, however, and arguably warranted the setting aside of the default judgment as having been fraudulently procured. Fed. R.Civ.P. 60(b)(3). Bruetman's lawyers would have been derelict in their duty to their client had they not attempted as they did to use the affidavits to get the default judgment set aside, and they cannot be faulted for not having obtained them within the first week after the default judgment. That brief delay was not sanctionable conduct; and since the lawyers had some genuinely new evidence, they were entitled to reinforce it with old evidence, cf. *Guinan v. United States*, 6 F.3d 468 (7th Cir.1993), namely Bruetman's denials (in his deposition) that he was trying to flee the jurisdiction, even if they should have had the deposition in hand at the time of the default judgment. Sanctions must not be used to terrorize lawyers and deter pertinacious but professionally responsible representation, even if such representation imposes upon the time of a busy judge. The only professional misconduct we find in this case was committed by Philips's lawyers, and they were not sanctioned.

▆ The last issue we need discuss is the judge's imposition of a sanction of $500 on Bruetman for failure to cooperate in discovery. One of the orders that Bruetman was required to comply with as a condition of having the default judgment set aside on remand was an order to produce certain documents. He did produce them, in eight boxes which he deposited on the floor of Judge Duff's courtroom. Philips's lawyers objected that the documents were not inventoried (i.e., indexed), although they were grouped by subject matter, and a wrangle between counsel ensued which Judge Duff terminated by ordering Bruetman to pay the expense (estimated and liquidated at $500) to Philips of having one of Philips's lawyers monitor the inventorying. There was no reason to have Philips's lawyer looking over the shoulder of Bruetman's lawyer while the latter made an index of the documents any more than there would have been a reason to direct counsel to watch opposing counsel write a brief. Bruetman's lawyer should have been directed to make the inventory and give it to Philips's lawyer and if it was unsatisfactory the latter could make an appropriate motion to the judge, with a request for sanctions if necessary. There is such a thing as excessive judicial micromanagement of litigation. It is illustrated by constituting the lawyer for one party the schoolroom proctor of opposing counsel while the latter rummages through boxes, making a list of the documents contained in them.

The judge was understandably annoyed that Bruetman had produced the documents in open court, littering his courtroom with them. Bruetman (or his lawyer) was attempting ineptly to dramatize compliance with the order to produce, hoping thereby to strengthen the case for vacating the default judgment (it weakened it). But production of the documents at the wrong site was not the ground for the sanction.

The default judgment is affirmed, but the sanctions and disqualification orders are reversed. Issues not discussed are either academic in light of our disposition or are resolved against the proponent. We hope not to see this case a third time. There will be no award of costs in this court, and the court's opinion will be transmitted to the Executive Committee of the U.S. District Court for the Northern District of Illinois for possible disciplinary proceedings against Philips's lawyers.