**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

No. 95-50278

KAEPA, INC.,

Plaintiff-Appellee,

versus

ACHILLES CORPORATION,

Defendant-Appellant.

Appeal from the United States District Court
For the Western District of Texas

February 14, 1996

Before WIENER, EMILIO M. GARZA, and BENAVIDES, Circuit Judges.

WIENER, Circuit Judge:

The primary issue presented by this appeal is whether the district court erred by enjoining Defendant-Appellant Achilles Corporation from prosecuting an action that it filed in Japan as plaintiff, which essentially mirrored a lawsuit previously filed by Plaintiff-Appellee Kaepa, Inc. in state court and then being prosecuted in federal district court by Kaepa. Given the private nature of the dispute, the clear indications by both parties that

claims arising from their contract should be adjudicated in this country, and the duplicative and vexatious nature of the Japanese action, we conclude that the district court did not abuse its discretion by barring the prosecution of the foreign litigation. Accordingly, we affirm the grant of the antisuit injunction.

I.

FACTS AND PROCEEDINGS

This case arises out of a contractual dispute between two sophisticated, private corporations: Kaepa, an American company which manufactures athletic shoes; and Achilles, a Japanese business enterprise with annual sales that approximate one billion dollars. In April 1993, the two companies entered into a distributorship agreement whereby Achilles obtained exclusive rights to market Kaepa's footwear in Japan. The distributorship agreement expressly provided that Texas law and the English language would govern its interpretation, that it would be enforceable in San Antonio, Texas, and that Achilles consented to the jurisdiction of the Texas courts.[1]

Kaepa grew increasingly dissatisfied with Achilles's

---

[1]The applicable language of the agreement reads:
This Agreement shall be governed by the laws of the State of Texas, U.S.A., and shall be enforceable in San Antonio, Texas. The English version of this Agreement and the English language shall govern the interpretation and meaning of all words and phrases used herein. Distributor [Achilles] consents to jurisdiction in the State of Texas, U.S.A.
The district court held that this clause (1) permits jurisdiction in Texas, and (2) requires that the agreement be interpreted under United States law and the English language. Neither party challenges this ruling.

performance under the contract. Accordingly, in July of 1994, Kaepa filed suit in Texas state court, alleging (1) fraud and negligent misrepresentation by Achilles to induce Kaepa to enter into the distributorship agreement, and (2) breach of contract by Achilles. Thereafter, Achilles removed the action to federal district court, and the parties began a laborious discovery process which to date has resulted in the production of tens of thousands of documents. In February 1995, after appearing in the Texas action, removing the case to federal court, and engaging in comprehensive discovery, Achilles brought its own action in Japan, alleging mirror-image claims: (1) fraud by Kaepa to induce Achilles to enter into the distributorship agreement, and (2) breach of contract by Kaepa.

Back in Texas, Kaepa promptly filed a motion asking the district court to enjoin Achilles from prosecuting its suit in Japan (motion for an antisuit injunction). Achilles in turn moved to dismiss the federal court action on the ground of forum non conveniens. The district court denied Achilles's motion to dismiss and granted Kaepa's motion to enjoin, ordering Achilles to refrain from litigating the Japanese action and to file all of its counterclaims with the district court. Achilles timely appealed the grant of the antisuit injunction.[2]

---

[2]Achilles does not challenge the denial of its motion to dismiss.

II.

ANALYSIS

A.   PROPRIETY OF THE ANTISUIT INJUNCTION

Achilles's primary argument is that the district court failed to give proper deference to principles of international comity when it granted Kaepa's motion for an antisuit injunction.  We review the decision to grant injunctive relief for abuse of discretion.[3] Under this deferential standard, findings of fact are upheld unless clearly erroneous, whereas legal conclusions "`are subject to broad review and will be reversed if incorrect.'"[4]

It is well settled among the circuit courtsSQincluding this oneSQwhich have reviewed the grant of an antisuit injunction that the federal courts have the power to enjoin persons subject to their jurisdiction from prosecuting foreign suits.[5]  The circuits differ, however, on the proper legal standard to employ when

---

[3]See Western Directories, Inc. v. Southwestern Bell, 63 F.3d 1378, 1390 (5th Cir. 1995); Apple Barrel Productions, Inc. v. Beard, 730 F.2d 384, 386 (5th Cir. 1984).

[4]Apple Barrel, 730 F.2d 384 (quoting Commonwealth Life Insurance Co. v. Neal, 669 F.2d 300, 304 (5th Cir. 1982)).

[5]See, e.g., Gau Shan Co. v. Bankers Trust Co., 956 F.2d 1349, 1352 (6th Cir. 1992); China Trade & Dev. Corp. v. M.V. Choong Yong, 837 F.2d 33, 35 (2d Cir. 1987); Laker Airways v. Sabena, 731 F.2d 909, 926 (D.C. Cir. 1984); Seattle Totems Hockey Club, Inc. v. National Hockey League, 652 F.2d 852, 855 (9th Cir. 1981), cert. denied, 457 U.S. 1105 (1982); In Re Unterweser Reederei Gmbh, 428 F.2d 888, 890 (5th Cir. 1970), aff'd on rehearing en banc, 446 F.2d 907 (1971), rev'd on other grounds sub nom. Bremen v. Zapata Offshore Co., 407 U.S. 1 (1972); Bethell v. Peace, 441 F.2d 495, 498 (5th Cir. 1971).

4

determining whether that injunctive power should be exercised.[6]  We have addressed the propriety of an antisuit injunction on two prior occasions, in In Re Unterweser Reederei Gmbh[7] and Bethell v. Peace.[8]  Emphasizing in both cases the need to prevent vexatious or oppressive litigation, we concluded that a district court does not abuse its discretion by issuing an antisuit injunction when it has determined "that allowing simultaneous prosecution of the same action in a foreign forum thousands of miles away would result in `inequitable hardship' and `tend to frustrate and delay the speedy and efficient determination of the cause.'"[9]  The Seventh and the

---

[6]Compare, e.g., Seattle Totems, 652 F.2d at 855-56 and Unterweser, 428 F.2d 888 with Gau Shan, 956 F.2d at 1355 and China Trade, 837 F.2d at 36;

[7]Unterweser, 428 F.2d 888.

[8]Bethell, 441 F.2d 495.

[9]Unterweser, 428 F.2d at 890, 896 (noting as well that antisuit injunctions have been granted when foreign litigation would (1) frustrate a policy of the forum issuing the injunction; (2) be vexatious or oppressive; (3) threaten the issuing court's in rem or quasi in rem jurisdiction; or (4) prejudice other equitable considerations); see also Bethell, 441 F.2d at 498 ("[T]he court was within its discretion in relieving the plaintiff of expense and vexation of having to litigate in a foreign court."). Cf. Gau Shan, 956 F.2d at 1353 (concluding that the Fifth Circuit "rel[ies] primarily upon considerations of vexatiousness or oppressiveness in a race to judgment in the foreign forum as sufficient grounds for an [antisuit] injunction") (citing Unterweser, 428 F.2d at 896); Seattle Totems, 652 F.2d at 855-56 (discussing Unterweser and Bethell).

Ninth Circuits have either adopted[10] or "incline[d] toward"[11] this approach, but other circuits have employed a standard that elevates principles of international comity to the virtual exclusion of essentially all other considerations.[12]

Achilles urges us to give greater deference to comity and apply the latter, more restrictive standard. We note preliminarily that, even though the standard espoused in Unterweser and Bethell focuses on the potentially vexatious nature of foreign litigation, it by no means excludes the consideration of principles of comity. We decline, however, to require a district court to genuflect before a vague and omnipotent notion of comity every time that it must decide whether to enjoin a foreign action.

In the instant case, for example, it simply cannot be said

---

[10]See Seattle Totems, 652 F.2d at 855-56 (discussing Unterweser and Bethell) (holding that it is within the district court's discretion to grant an antisuit injunction when the adjudication of an issue "is likely to result in unnecessary delay and substantial inconvenience and expense to the parties and witnesses . . . [as well as] inconsistent rulings or even a race to judgment").

[11]See Philips Medical Sys. Int'l B.V. v. Bruetman, 8 F.3d 600, 605 (7th Cir. 1993); see also Allendale Mut. Ins. Co. v. Bull Data Systems, Inc., 10 F.3d 425, 431 (7th Cir. 1993). Cf. Sperry Rand Corp. v. Sunbeam Corp., 285 F.2d 542 (7th Cir. 1961).

[12]See, e.g., Gau Shan, 956 F.2d at 1355; China Trade, 837 F.2d at 36; Laker Airways, 731 F.2d at 927, 937. The weakness in the foundation of the dissent's opinion is that it relies extensively on these cases while virtually disregarding our holdings in Unterweser and Bethell. The strict stare decisis policy of this court prevents us from joining in the dissent's abrogation of the holdings of two prior panels on this issue through purported distinctions without real differences. See United States v. Parker, No. 94-10557, slip op. 1367, 1370 (5th Cir. Jan. 3, 1996) ("`[O]ne panel may not overrule the decisionSQright or wrongSQof a prior panel, absent en banc reconsideration or a superseding contrary decision of the Supreme Court'") (quoting In re Dyke, 943 F.2d 1435, 1442 (5th Cir. 1991)).

that the grant of the antisuit injunction actually threatens relations between the United States and Japan.  First, no public international issue is implicated by the case:  Achilles is a private party engaged in a contractual dispute with another private party.  Second, the dispute has been long and firmly ensconced within the confines of the United States judicial system:  Achilles consented to jurisdiction in Texas; stipulated that Texas law and the English language would govern any dispute; appeared in an action brought in Texas; removed that action to a federal court in Texas; engaged in extensive discovery pursuant to the directives of the federal court; and only then, with the federal action moving steadily toward trial, brought identical claims in Japan.  Under these circumstances, we cannot conclude that the district court's grant of an antisuit injunction in any way trampled on notions of comity.

On the contrary, the facts detailed above strongly support the conclusion that the prosecution of the Japanese action would entail "an absurd duplication of effort"[13] and would result in unwarranted inconvenience, expense, and vexation.  Achilles's belated ploy of filing as putative plaintiff in Japan the very same claims against Kaepa that Kaepa had filed as plaintiff against Achilles smacks of cynicism, harassment, and delay.  Accordingly, we hold that the district court did not abuse its discretion by granting Kaepa's

---

[13]Allendale, 10 F.3d at 430-31.

motion for an antisuit injunction.[14]

B.  RULE 65 REQUIREMENTS

Achilles also argues that the district court erred by failing to meet several requirements of Federal Rule of Civil Procedure 65 before issuing the antisuit injunction.  Rule 65(a)(1) provides that "[n]o preliminary injunction shall be issued without notice to the adverse party."  We have interpreted the notice requirement of Rule 65(a)(1) to mean that "where factual disputes are presented, the parties must be given a fair opportunity and a meaningful hearing to present their differing versions of those facts before a preliminary injunction may be granted."[15]  If no factual dispute is involved, however, no oral hearing is required; under such

---

[14]The parties also debated the applicability of Federal Rule of Civil Procedure 13(a) to claims brought in foreign courts.  Rule 13(a) governs compulsory counterclaims and provides in relevant part:  "A pleading shall state as a counterclaim any claim which at the time of serving the pleading the pleader has against any opposing party, if it arises out of the transaction or occurrence that is the subject matter of the opposing party's claim . . . ."  FED. R. CIV. P. 13(A).

Achilles concedes that under Rule 13, the Japanese action constitutes a compulsory counterclaim.  Nonetheless, Achilles argues that Rule 13 does not apply to claims brought in foreign courts and thus cannot be relied on as a basis for prohibiting the prosecution of the Japanese action.  As we have decided on other grounds that the district court properly exercised its authority in enjoining the Japanese action, we need not address whether Rule 13 governs foreign suits.  We note, however, that our holding today is consistent with the purpose of Rule 13, which is to "`prevent multiplicity of actions and to achieve resolution in a single suit of all disputes arising out of common matters.'"  Seattle Totems, 652 F.2d at 854 (quoting Southern Construction Co. v. Pickard, 371 U.S. 57 (1962)).

[15]Commerce Park at DFW Freeport v. Mardian Construction Co., 729 F.2d 334, 342 (5th Cir. 1984) (discussing Marshall Durbin Farms, Inc. v. National Farmers Organization, Inc., 446 F.2d 353 (5th Cir. 1971)).

circumstances the parties need only be given "ample opportunity to present their respective views of the legal issues involved."[16] In the instant case, the district court did not rely on any disputed facts in determining whether it could properly grant an antisuit injunction. Moreover, both parties presented comprehensive memoranda in support of their positions on the issue. Accordingly, the district court did not violate Rule 65(a)(1) by failing to conduct an oral hearing before granting the antisuit injunction.

Achilles also argues that the district court violated Rule 65(c) by not requiring Kaepa to post a bond. Rule 65(c) provides that "[n]o . . . preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper . . . ."[17] In holding that the amount of security required pursuant to Rule 65(c) "is a matter for the discretion of the trial court,"[18] we have ruled that the court "may elect to require no security at all."[19] Thus, the district court did not violate Rule

---

[16]Commerce Park, 729 F.2d at 341; see also Federal Savings and Loan Insurance Corp. v. Dixon, 835 F.2d 554, 558 (5th Cir. 1987). Cf. Jones v. Newton, 775 F.2d 1316, 1318 (noting that an oral hearing on motions is typically not required in this circuit); Security and Exchange Commission v. First Financial Group of Texas, Inc., 659 F.2d 660, 669 (5th Cir. 1981).

[17]FED. R. CIV. P. 65(c).

[18]Corrigan Dispatch Company v. Casa Guzman, 569 F.2d 300, 303 (5th Cir. 1978); see also City of Atlanta v. Metropolitan Atlanta Rapid Transit Authority, 636 F.2d 1084, 1094 (5th Cir. Unit B Feb. 1981). But see Continuum Company, Inc. v. Incepts, Inc., 873 F.2d 801, 803 (5th Cir.), reconsidered on other grounds, 883 F.2d 333 (5th Cir. 1989).

[19]Corrigan Dispatch, 569 F.2d at 303.

65(c) by failing to compel Kaepa to post a bond.[20]

## III.

## CONCLUSION

For the foregoing reasons, the district court's grant of Kaepa's motion to enjoin the litigation of Achilles's action in Japan is

AFFIRMED.

EMILIO M. GARZA, Circuit Judge, dissenting:

International comity represents a principle of paramount importance in our world of ever increasing economic interdependence. Admitting that "comity" may be a somewhat elusive concept[21] does not mean that we can blithely ignore its cautionary dictate.[22] Unless we proceed in each instance with respect for the

---

[20]Moreover, under the instant factsSQthe party enjoined being the party that created any risk of damages for delay or duplication by filing the second, mirror-image suit in Japan after contractually consenting to the jurisdiction and substantive law of TexasSQthe district court cannot be said to have abused its discretion: The injunction can only work to avoid damages, not cause them.

[21]    As one commentator has observed:

Comity has been defined variously as the basis of international law, a rule of international law, a synonym for private international law, a rule of choice of law, courtesy, politeness, convenience or goodwill between sovereigns, a moral necessity, expediency, reciprocity or considerations of high international politics concerned with maintaining amicable and workable relationships between nations.

Joel R. Paul, Comity in International Law, 32 Harv. Int'l L.J. 1, 1-2 (1991) (footnotes omitted).

[22]        See *Hilton v. Guyot*, 159 U.S. 113, 16 S. Ct. 139, 40 L. Ed. 95 (1894), in which the Supreme Court stated:

"Comity," in the legal sense, is neither a matter of absolute obligation, on the one hand, nor of mere courtesy and good will, upon the other. But it is the recognition which one nation allows within its territory to the legislative, executive, or judicial acts

-10-

independent jurisdiction of a sovereign nation's courts, we risk provoking retaliation in turn, with detrimental consequences that may reverberate far beyond the particular dispute and its private litigants. Amicable relations among sovereign nations and their judicial systems depend on our recognition, as federal courts, that we share the international arena with co-equal judicial bodies, and that we therefore act to deprive a foreign court of jurisdiction only in the most extreme circumstances. Because I feel that the majority's opinion does not grant the principle of international comity the weight it deserves, I must respectfully dissent.

I

A

I do not quarrel with the well established principle, relied on by the majority, that our courts have the power to control the conduct of persons subject to their jurisdiction, even to the extent of enjoining them from prosecuting in a foreign jurisdiction. I write to emphasize, however, that under concurrent jurisdiction, "parallel proceedings on the same in personam claim should ordinarily be allowed to proceed simultaneously, at least until a judgment is reached in one which can be pled as *res judicata* in the other." *Laker Airways Ltd. v. Sabena, Belgian World Airlines*, 731 F.2d 909, 926-27 (D.C. Cir. 1984).[23] The filing

---

of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens or of other persons who are under protection of its laws.
159 U.S. at 163-64, 16 S. Ct. at 143.

[23]     *See also Princess Lida of Thurn and Taxis v. Thompson*, 305 U.S. 456, 466, 59 S. Ct. 275, 280, 83 L. Ed. 285 (1939) ("[I]t is settled that where the judgment sought is strictly in personam, both the state court and the federal

of a second parallel action in another jurisdiction does not necessarily conflict with or prevent the first court from exercising its legitimate concurrent jurisdiction. *Id.* at 926. In the ordinary case, both forums should be free to proceed to a judgment, unhindered by the concurrent exercise of jurisdiction in another court.[24]

The issuance of an antisuit injunction runs directly counter to this principle of tolerating parallel proceedings. An antisuit injunction "conveys the message . . . that the issuing court has so little confidence in the foreign court's ability to adjudicate a given dispute fairly and efficiently that it is unwilling even to allow the possibility." *Gau Shan Co. v. Bankers Trust Co.*, 956 F.2d 1349, 1355 (6th Cir. 1992). It makes no difference that in formal terms the injunction is only addressed to the parties. The

---

court, having concurrent jurisdiction, may proceed with the litigation at least until judgment is obtained in one of them which may be set up as res judicata in the other.").

[24] The Supreme Court in *Kline v. Burke Const. Co.*, 260 U.S. 226, 43 S. Ct. 79, 67 L. Ed. 226 (1922), had the following to say about concurrent jurisdiction:

> [A] controversy over a mere question of personal liability does not involve the possession or control of a thing, and an action brought to enforce such a liability does not tend to impair or defeat the jurisdiction of the court in which a prior action for the same cause is pending. Each court is free to proceed in its own way and its own time, without reference to the proceedings in the other court. Whenever a judgment is rendered in one of the courts and pleaded in the other, the effect of that judgment is to be determined by the application of the principles of res adjudicata by the court in which the action is still pending in the orderly exercise of its jurisdiction, as it would determine any other question of fact or law arising in the progress of the case. The rule, therefore, has become generally established that where the action first brought is in personam and seeks only a personal judgment, another action for the same cause in another jurisdiction is not precluded.

260 U.S. at 230, 43 S. Ct. at 81.

-12-

antisuit injunction operates to restrict the foreign court's ability to exercise its jurisdiction as effectively as if it were addressed to the foreign court itself. *Laker Airways*, 731 F.2d at 927; *Donovan v. City of Dallas*, 377 U.S. 408, 413, 84 S. Ct. 1579, 1582-83, 12 L. Ed. 2d 409 (1964). Enjoining the parties from litigating in a foreign court will necessarily compromise the principles of comity, and may lead to undesirable consequences. For example, the foreign court may react by issuing a similar injunction, thereby preventing any party from obtaining a remedy. *Laker Airways*, 731 F.2d at 927. The foreign court may also be less inclined to enforce a judgment by our courts. The refusal to enforce a foreign judgment, however, is less offensive than acting to prevent the foreign court from hearing the matter in the first place. *Id.* at 931.

Antisuit injunctions intended to carve out exclusive jurisdiction may also have unintended, widespread effects on international commerce. Without "an atmosphere of cooperation and reciprocity between nations," the ability to predict future consequences of international transactions will inevitably suffer. *Id.* To operate effectively and efficiently, international markets require a degree of predictability which can only be harmed by antisuit injunctions and the resulting breakdown of cooperation and reciprocity between courts of different nations. *Id.* The attempt to exercise exclusive jurisdiction over international economic affairs is essentially an intrusion into the realm of international

economic *policy* that should appropriately be left to our legislature and the treaty making process.[25] As the court in *Laker Airways* stated, "Absent an explicit directive from Congress, this court has neither the authority nor the institutional resources to weigh the policy and political factors that must be evaluated when resolving competing claims of jurisdiction. In contrast, diplomatic and executive channels are, by definition, designed to exchange, negotiate, and reconcile the problems which accompany the realization of national interests within the sphere of international association." *Laker Airways*, 731 F.2d at 955.

The majority appears to require an affirmative showing that the granting of an antisuit injunction in this case would immediately and concretely affect adversely the relations between the United States and Japan. Unless there is evidence that this antisuit injunction would "actually threaten" the relations between the two countries, the majority is comfortable to assume otherwise. *Cf. Allendale Mut. Ins. Co. v. Bull Data Systems, Inc.*, 10 F.3d 425, 431-33 (7th Cir. 1993) (requiring evidence of concrete harm to the foreign relations of the United States). Some courts have gone

---

[25] As the Sixth Circuit in *Gau Shan Co.* recognized:

The days of American hegemony over international economic affairs have long since passed. The United States cannot today impose its economic will on the rest of the world and expect meek compliance, if indeed it ever could. The modern era is one of world economic interdependence, and economic interdependence requires cooperation and comity between nations.

*Gau Shan Co. v. Bankers Trust Co.*, 956 F.2d 1349, 1354 (6th Cir. 1992). *See generally* Thomas E. Burke, Case Note, Gau Shan Co. v. Bankers Trust Co.: What Should Be the Role of International Comity in the Issuance of Antisuit Injunctions?, 18 N.C. J. Int'l L. & Com. Reg. 475 (1993).

-14-

so far as to suggest that we might expect, for example, a representative of the foreign nation to convey their country's concern regarding the issuance of an antisuit injunction in that case. *See, e.g., id.* at 431; *Philips Medical Sys. Int'l B.V. v. Bruetman*, 8 F.3d 600, 605 (7th Cir. 1993). Insisting on evidence of immediate and concrete harm, in the form of a diplomatic protest or otherwise, is both unrealistic and shortsighted. As with most transnational relations, the potential harm to international comity caused by the issuance of a specific antisuit injunction will be as difficult to predict, as it will be to remedy. It is precisely this troubling uncertainty, and the recognition that our courts are ill equipped to weigh these types of international policy considerations, that cautions us to make the respectful deference underlying international comity the rule rather than the exception.

B

In holding that the district court in this case did not abuse its discretion by enjoining Achilles, a Japanese corporation, from proceeding with its lawsuit filed in the sovereign nation of Japan, the majority appears to rely primarily on the duplicative nature of the Japanese suit and the resulting "unwarranted inconvenience, expense, and vexation."[26] The inconvenience, expense and vexation,

---

[26]   *Cf. In re Unterweser Reederei, Gmbh*, 428 F.2d 888, 890, 896 (5th Cir. 1970) (affirming issuance of antisuit injunction where "allowing simultaneous prosecution of the same action in a foreign forum thousands of miles away would result in 'inequitable hardship' and 'tend to frustrate and delay the speedy and efficient determination of the cause'"), *rev'd on other grounds sub nom. M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 92 S. Ct. 1907, 32 L. Ed. 2d 513 (1972); *Seattle Totems Hockey Club v. National Hockey League*, 652 F.2d 852, 856 (9th Cir. 1981) (affirming antisuit injunction where adjudication in two separate

-15-

however, are factors likely to be present whenever there is an exercise of concurrent jurisdiction by a foreign court. *Sea Containers Ltd. v. Stena AB*, 890 F.2d 1205, 1213-14 (D.C. Cir. 1989). The majority's standard can be understood to hold, therefore, that "a duplication of the parties and issues, alone, is sufficient to justify a foreign antisuit injunction." *Gau Shan Co.*, 956 F.2d at 1353; *see also Laker Airways*, 731 F.2d at 928 (concluding that this rationale "is *prima facie* inconsistent with the rule permitting parallel proceedings in concurrent in personam actions"). Under this standard, concurrent jurisdiction involving a foreign tribunal will rarely, if ever, withstand the request for an antisuit injunction.

By focusing on the potential hardship to Kaepa of having to litigate in two forums,[27] the majority applies an analysis that is

---

actions was "likely to result in unnecessary delay and substantial inconvenience and expense to the parties and witnesses," and "could result in inconsistent rulings or even a race to judgment"), *cert. denied*, 457 U.S. 1105, 102 S. Ct. 2902, 73 L. Ed. 2d 1313 (1982).

[27]     I also believe the majority errs by relying on two other factors in this case. The majority reasons that the "clear indications by both parties that claims arising from their contract should be adjudicated in this country" lends support to the conclusion that the district court did not abuse its discretion by enjoining the foreign litigation. The majority reaches this conclusion even though the district court found that the jurisdictional language in the parties' agreement was *permissive* of Texas jurisdiction, rather than *exclusive*. The majority also appears to overlook the fact that this dispute involves experienced and sophisticated businessmen who were perfectly capable of negotiating an exclusive forum clause had they desired one. *See Bremen v. Zapata*, 407 U.S. 1, 12-13, 92 S. Ct. 1907, 1914, 32 L. Ed. 2d 513 (1972) ("There are compelling reasons why a freely negotiated private international agreement, unaffected by fraud, undue influence, or overweening bargaining power, such as that involved here, should be given effect."). Therefore, if anything, the district court's action))in reserving exclusive jurisdiction over this suit))runs directly counter to the parties' intentions, as evinced by their freely negotiated contract. *Cf. id.* ("The expansion of American business and industry will hardly be encouraged if, notwithstanding solemn contracts, we insist on a parochial concept that all disputes must be resolved under our laws and in our courts."). I am also not persuaded by the majority's reliance on the inference that Achilles' actions, by

more appropriately brought to bear in the context of a motion to dismiss for *forum non conveniens*.[28]  *See Laker Airways*, 731 F.2d at 928.  Considerations that are appropriate in deciding whether to decline jurisdiction are not as persuasive when deciding whether to deprive another court of jurisdiction.  "The policies of avoiding hardships to the parties and promoting the economies of consolidation litigation 'do not outweigh the important principles of comity that compel deference and mutual respect for concurrent foreign proceedings.  Thus, the better rule is that duplication of parties and issues alone is not sufficient to justify issuance of an antisuit injunction.'"  *Gau Shan Co.*, 956 F.2d at 1355 (quoting *Laker Airways*, 731 F.2d at 928); *see also China Trade & Dev. Corp. v. M.V. Choong Yong*, 837 F.2d 33, 36 (2nd Cir. 1987; *Compagnie des Bauxites de Guinea v. Insurance Co. of N. Am.*, 651 F.2d 877, 887 (3d Cir. 1981), *aff'd on other grounds sub nom. Insurance Corp. of Ireland, Ltd. v. Compagnie des Bauxite de Guinee*, 456 U.S. 694, 102 S. Ct. 2099, 72 L. Ed. 2d 492 (1982).  A dismissal on grounds of *forum non conveniens* by either court in this case would satisfy the

---

filing their action in Japan some seven or eight months after they were sued in Texas, "smacks of cynicism, harassment, and delay." *See China Trade & Dev. Corp. v. M.V. Choong Yong*, 837 F.2d 33, 34-35 (2nd Cir. 1987) (vacating injunction even though second suit was filed almost two-and-a-half years after initial suit); *Compagnie des Bauxites de Guinea v. Insurance Co. of N. Am.*, 651 F.2d 877, 880, 887 (3d Cir. 1981) (vacating injunction even though second suit was filed almost four years later).  I do not believe that Achilles' impure motives, if any, should outweigh the important interests of international comity at issue in this case. *Cf. Donovan v. City of Dallas*, 377 U.S. 408, 415, 84 S. Ct. 1579, 1583, 12 L. Ed. 2d 409 (1964) (Harlan, J., dissenting) (disagreeing with the majority's holding that the state court was without power to enjoin federal court proceedings even though the suit was found to be vexatious and harassing).

[28]     On the doctrine of *forum non conveniens*, see *Piper Aircraft Co. V. Reyno*, 454 U.S. 235, 258-61, 102 S. Ct. 252, 267-68, 70 L. Ed. 2d 419 (1981).

majority's concern with avoiding hardship to the parties, without harming the interests of international comity.[29] The district court is not in a position, however, to make the *forum non conveniens* determination on behalf of the Japanese court. In light of the important interests of international comity, the decision by a United States court to deprive a foreign court of jurisdiction must be supported by far weightier factors than would otherwise justify that court's decision to decline its own jurisdiction on *form non conveniens* grounds.

C

Accordingly, I believe that the standard followed by the Second, Sixth, and D.C. Circuits more satisfactorily respects the principle of concurrent jurisdiction and safeguards the important interests of international comity. Under this stricter standard, a district court should look to only two factors in determining whether to issue an antisuit injunction: (1) whether the foreign action threatens the jurisdiction of the district court; and (2) whether the foreign action was an attempt to evade important public policies of the district court.[30] *Gau Shan Co.*, 956 F.2d at 1355;

---

[29] On the issue of *forum non conveniens*, I note that this case involves a dispute between an American company and a Japanese company over an exclusive distributorship agreement covering the Japanese shoe market. Many of the third-party witnesses are located in Japan. Moreover, the district court found that Japan would be "an adequate forum" for both parties, and rejected Kaepa's argument that a Japanese court would not treat Kaepa with the same impartiality that would be shown to Achilles in an American court.

[30] I note that we are required to apply a similarly strict standard in tolerance of concurrent state court proceedings. *See* 28 U.S.C. § 2283 ("A court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where *necessary in aid of its jurisdiction*, or to *protect or effectuate its judgments*.") (emphasis

*China Trade*, 837 F.2d at 36; *Laker Airways*, 731 F.2d at 927. Neither of these factors are present in this case.

"Courts have a duty to protect their legitimately conferred jurisdiction to the extent necessary to provide full justice to litigants." *Laker Airways*, 731 F.2d at 927. Where the concurrent proceeding effectively threatens to paralyze the jurisdiction of the court, or where the foreign court is attempting to carve out exclusive jurisdiction over the action, an antisuit injunction may legitimately be necessary to protect the court's jurisdiction. In those rare cases where the foreign action is interdictory rather than parallel, the issuance of an antisuit injunction is primarily a defensive action not inconsistent with the principles of international comity. The court in *Laker Airways* affirmed the issuance of an antisuit injunction where the foreign action "was instituted by the foreign defendants for the sole purpose of terminating the United States claim." *Id.* at 915. In fact, the British Court of Appeals had enjoined the plaintiff from pursuing its claims against British defendants in a United States court under United States law. *Id.* Significantly, the United States district court in *Laker Airways* also made clear that its injunction

_____

added). Section 2283 "does not allow a federal court to enjoin state proceedings to protect a judgment that the federal court may make in the future but has not yet made." *Laker Airways Ltd. v. Sabena, Belgian World Airlines*, 731 F.2d 909, 929 n.59 (D.C. Cir. 1984) (internal quotation marks omitted). In addition, FED. R. CIV. P. 13(a) had been held inapplicable in this context, and accordingly, "a federal court is barred by § 2283 from enjoining a party from proceeding in state court on a claim that should have been pleaded as a compulsory counterclaim in a prior federal suit." *Seattle Totems Hockey Club v. National Hockey League*, 652 F.2d 852, 855 n.5 (9th Cir. 1981). This rule of restraint and respect regarding state court proceeding should apply with even greater force in the context of foreign tribunals.

was intended solely to protect its jurisdiction by preventing the defendants from taking any action before a foreign court or governmental authority that would interfere with the litigation pending before the district court. *Id.* at 919. The injunction was not intended to prevent all concurrent proceedings in foreign courts, only those which directly threatened the district court's jurisdiction. There is no evidence in this case that Achilles' action in Japan in any way threatens the district court's exercise of its concurrent jurisdiction. While the Japanese action may eventually proceed to a judgment which can be pled as *res judicata* in the district court, no attempt has been made to carve out exclusive jurisdiction on behalf of the foreign tribunal.[31]

As an example of where a court may need to act in order to protect its jurisdiction, a long-standing exception to the rule tolerating concurrent jurisdiction has been recognized for proceedings *in rem* or *quasi in rem*. *China Trade*, 837 F.2d at 36.[32] Because the second action may pose an inherent threat to the court's basis for jurisdiction, an antisuit injunction may be appropriate in an *in rem* or *quasi in rem* proceeding. *Id.* "Where jurisdiction is based on the presence of property within the

---

[31] *See Gau Shan Co. v. Bankers Trust Co.*, 956 F.2d 1349, 1354 (6th Cir. 1992) (concluding that the possibility that a foreign ruling might result in the voluntary dismissal of the suit was merely a threat to the plaintiff's interest in prosecuting its suit, and was not a threat to the jurisdiction of the United States court).

[32] *See also Donovan*, 377 U.S. at 412, 84 S. Ct. at 1582 (citing *Princess Lida of Thurn and Taxis v. Thompson*, 305 U.S. 456, 59 S. Ct. 275, 83 L. Ed. 285 (1939)).

court's jurisdictional boundaries, a concurrent proceeding in a foreign jurisdiction poses the danger that the foreign court will order the transfer of the property out of the jurisdictional boundaries of the first court, thus depriving it of jurisdiction over the matter. This concern of course is not present in this *in personam* proceeding." *Gau Shan Co.*, 956 F.2d at 1358. Likewise, this concern is not present in the current *in personam* proceeding, the focus of which is a distribution agreement. I note that *In re Unterweser Reederei, Gmbh*, relied on by the majority, was an *in rem* proceeding, justifying the more permissive standard applied to the issuance of an antisuit injunction in that case.[33]

Under the second factor of the stricter standard, an antisuit injunction may also be appropriate where a party seeks to evade important policies of the forum by bringing suit in a foreign

---

[33]    The other Fifth Circuit precedent relied on by the majority is equally distinguishable and does not control the outcome in this case. *See Bethell v. Peace*, 441 F.2d 495 (5th Cir. 1971). The panel in *Bethel* reviewed an antisuit injunction that was issued only after *a judgment* had been entered upon a motion for summary judgment. 441 F.2d at 496. In affirming the issuance of the injunction, the Fifth Circuit panel also relied on "the power of a court of equity of one state to restrain *its own citizens* from prosecuting actions in a sister state when such actions serve to vex, harass, or oppress an opponent." *Id.* at 498. The panel did not discuss the interests of international comity.
    The majority purports not to be persuaded by the distinctions I identify in *Bethel* and *Unterweser*. They are, however, distinctions that make all the difference under the appropriate standard for evaluating antisuit injunctions. The issuance of an antisuit injunction *after judgment* or in an *in rem* proceeding falls under a well-recognized exception to the otherwise strict standard articulated by the Second, Sixth and D.C. Circuits. *See China Trade*, 837 F.2d at 36 (recognizing long-standing exception to usual rule tolerating concurrent proceedings for proceeding *in rem* or *quasi in rem*); *Laker Airways*, 731 F.2d at 928 (concluding that "a court may freely protect the integrity of its judgments by preventing their evasion through vexatious or oppressive relitigation," and citing *Bethel* for this proposition). Given the procedural posture in *Bethel* and *Unterweser*, the permissive "standard" applied in these cases is entirely consistent with the strict standard I am proposing today. Therefore, contrary to what the majority asserts, adopting the strict standard for evaluating the issuance of antisuit injunctions in the Fifth Circuit would not require us to overrule any prior decision by this Court.

-21-

court. *Gau Shan Co.*, 956 F.2d at 1357. "While an injunction may be appropriate when a party attempts to evade compliance with a statute of the forum that effectuates important public policies, an injunction is not appropriate merely to prevent a party from seeking 'slight advantages in the substantive or procedural law to be applied in a foreign court.'" *China Trade*, 837 F.2d at 37 (quoting *Laker Airways*, 731 F.2d at 931, n.73).[34] The policy favoring the resolution in a single lawsuit of all disputes arising out of a common matter does not, as noted earlier, outweigh the important interests of international comity. Rather, the principle enunciated under the second factor is "similar to the rule that a foreign judgment not entitled to full faith and credit under the Constitution will not be enforced within the United States when contrary to the crucial public policies of the forum in which enforcement is requested." *Laker Airways*, 731 F.2d at 931. Under this principle, a court is not required to give effect to a judgment that does violence to the forum's own fundamental interests. *Id.* Since the issuance of an antisuit injunction is a much greater and more direct interference with a foreign country's judicial process than is the refusal to enforce a judgment, it follows that an antisuit injunction should only be issued in the most extreme circumstances. Although the majority questions the purity of

---

[34] *See also Laker Airways*, 731 F.2d at 931 n.73 ("An impermissible evasion is much more likely to be found when the party attempts to elude compliance with a statute of specific applicability upon which the party seeking an injunction may have relied and which is designed to effectuate important state policies.").

Achilles's motives in filing suit in Japan, there is no evidence that Achilles is attempting to evade any important policy of the United States forum.

II

Because neither factor supports the issuance of an antisuit injunction in this case, I believe the district court abused its discretion by enjoining Achilles from prosecuting an action filed in Japan.  Accordingly, I respectfully dissent.