**Alistair J. MACPHAIL Plaintiff,**

v.

**OCEANEERING INTERNATIONAL, INC. Defendant.**

**No. CIV.A.G–01–266.**

United States District Court,
S.D. Texas,
Galveston Division.

Feb. 11, 2002.

Joseph W Walker, Franklin Mosele & Walker, Gary J Siller, Strasburger & Price LLP, Houston, for Alistair J MacPhail, plaintiffs.

James Patrick Cooney, Royston Rayzor et al, Houston, for Oceaneering International, Inc., defendants.

## ORDER GRANTING MACPHAIL'S MOTION TO ENJOIN AND DENYING OCEANEERING'S MOTION FOR RECONSIDERATION OF ITS MOTION TO DISMISS

KENT, District Judge.

Plaintiff Alistair MacPhail ("MacPhail") brings this lawsuit pursuant to the General

Maritime Law of the United States of America, the Jones Act, 46 U.S.C.App. § 688, and the state laws of Texas. Plaintiff seeks monetary damages for injuries suffered in the course of his employment as a saturation diver on the dive support vessel OCEAN WINSERTOR, owned and operated by Defendant Oceaneering International, Inc. ("Oceaneering"), a large multi-national corporation headquartered in Houston, Texas. Now before this Court is MacPhail's Motion to Enjoin Oceaneering from further pursuing an action that it recently instituted against MacPhail in Australia and Oceaneering's Motion for Reconsideration of its Motion to Dismiss. For the reasons articulated below, MacPhail's Motion to Enjoin is hereby **GRANTED** and Oceaneering's Motion for Reconsideration is hereby **DENIED**.

## I.

The factual allegations giving rise to this manifestly tragic lawsuit have been largely set out in a prior Order. However, because they are intertwined with the issues sub judice, they are once again set out in full. While working for Oceaneering on May 18, 1998, MacPhail was committed under pressure to saturation diving in the China Sea.[1] Along with three diving partners, MacPhail was "stored" at a depth of approximately 100 feet with a breathing mix of helium and oxygen. During the thirty day period that MacPhail remained in saturation, he and his diving partners undertook approximately fifteen "bell runs" in which they would descend to the bottom in a diving bell, exit the bell for several hours of work and then return to the vessel to await their next run.

As MacPhail entered the diving bell for his second bell run, he observed oil, mud and sludge coating the hoses and the in-side of the bell. While on the bottom during the run, MacPhail experienced severe headaches, loss of concentration and decreased coordination. Upon returning to the bell, MacPhail felt disoriented. After the bell was returned to the vessel, MacPhail experienced headaches, loss of appetite, nausea and vomiting. MacPhail promptly and specifically reported his problems to surface management and the deck crew cleaned the interior of the bell.

Throughout the entire remainder of the saturation period, MacPhail continued to experience headaches, nausea, the loss of dental fillings and other severe and immediate medical problems. Although MacPhail repeatedly reported his troubles to management, the dive was not shut down and Oceaneering sent MacPhail on numerous subsequent dives. Later analysis of the seabed showed that the mud contained toxic levels of various metals including arsenic and mercury, cyanide, hydrogen sulfide and polychlorinated biphenyls.

When MacPhail was brought to the surface after thirty days, he was weakened, disoriented and exuding a "disgusting" odor. Clearly, he was in dire need of medical attention. MacPhail was transported first from the vessel to Hong Kong, where he received one day of medical attention, and then to Singapore, for additional treatment.

Upon returning to Australia (his residence at the time), MacPhail visited additional doctors provided by Oceaneering, but his condition continued to worsen. Over the ensuing months, MacPhail suffered sleep loss, depression, pain in his teeth, episodes of intense anger, excruciating headaches, fainting spells and a host of other complications. MacPhail continued to make requests to Oceaneering for ex-

---

1. Saturation diving requires a diver to spend extended periods of time under pressure be-fore resurfacing.

perts in hyperbaric medicine and toxicology, but was repeatedly told that Oceaneering was either looking for or unable to locate appropriate specialists. Ultimately (and incomprehensibly), Oceaneering failed to refer MacPhail to even one specialist experienced in diving medicine, chemical poisoning, or hyperbaric medicine.

Oceaneering appointed Cocks Macnish, an Australian law firm, to liaise with Mac-Phail. Two Oceaneering employees, Overland and Leung, assured MacPhail that the Cocks Macnish lawyers were not adversarial but rather, were appointed to allocate resources and seek out the best medical help available. However, Patricia Saraceni, the Cocks Macnish solicitor handling the case, blithely responded to Mac-Phail's repeated requests for help by informing him that Oceaneering could not continue to help him and that the situation required closure. Furthermore, Overland and Leung repeatedly telephoned Mac-Phail, deprecating his problems and offering him a sum of money to "put it all behind us." Later, after Saraceni, Overland and Leung informed MacPhail that there was nothing more medically that could be done, and threatened to cut off future medical and financial assistance. Sick, frightened and intimidated, MacPhail agreed to sign a Deed of Release and Discharge ("Release"). MacPhail was not represented by counsel at that time.

The Release was prepared by Saraceni and executed in Western Australia on November 3, 1999. In consideration of the Release, MacPhail received $280,000.00, a commitment on the part of Oceaneering to provide MacPhail with additional training courses and an escrow fund in the amount of $25,000.00 to cover future medical expenses. The forum selection clause contained in the Release reads:

> In the event of any dispute in respect of or arising from this Deed of Release and Discharge or any matter relating thereto the parties hereby agree to submit their dispute to the exclusive jurisdiction of the District Supreme Court of Western Australia, or to the Federal Court of Australia and the parties hereby agree to submit to the exclusive jurisdiction of the said courts.

The execution of the Release was followed by the entry of a judgment in the District Court of Western Australia, Perth.

By the spring of 2000, MacPhail was a shadow of his former self. Severely depressed and in constant pain, MacPhail found himself unable to work or carry on normal relationships with others. That year, he became aware that one of his similarly situated diving partners had received helpful treatment in the United States from the Van Meter hyperbaric group. MacPhail subsequently traveled to the United States and was treated by the Van Meter specialists for one month, beginning on November 15, 2000. MacPhail was diagnosed with multiple physical abnormalities, including significant brain and nerve damage, all linked to toxic chemical exposure and decompression sickness. Tragically, one Van Meter physician noted that MacPhail's "short, medium and long term prognosis would have been very different had he been immediately treated."

MacPhail later discovered that Oceaneering had *never* contacted any hyperbaric specialist or expert toxicologist, but rather, relied upon individuals with no diving medical experience to coordinate his treatment, even though Oceaneering actually knew of such specialists and had used them in the past. Furthermore, Oceaneering originally provided Plaintiff with an incomplete chemical analysis of the substances he had been exposed to while diving, even though Oceaneering had possessed the complete analysis. This omission may have substantially impeded his treatment and recovery, and was, at the

very least, deceitfully withheld from him during the sham negotiation of his "settlement," reached under extreme duress.

In light of these discoveries, MacPhail was moved to file this lawsuit. Oceaneering responded by filing a Motion to Dismiss for improper venue pursuant to the forum selection clause recited above. On October 17, 2001, the Court issued an Order Denying Oceaneering's Motion to Dismiss. In that Order, the Court determined that "...the forum selection clause at issue [is] unreasonable and therefore unenforceable because its enforcement would violate a strong public policy and because Plaintiff would thereby be deprived of his day in court. To find such a clause valid and enforceable in the precise facts of this case would amount to an unmistakable violation of our strong public policy protecting the rights of seamen as wards of the American admiralty courts, and furthermore, would effectively deprive MacPhail of his rightful day in a court of proper jurisdiction." Accordingly, the Court permitted this action to proceed here in the Southern District of Texas. As such, the Parties have since continued with discovery and trial preparation.

Around January 1, 2002, MacPhail's lead counsel, Joseph W. Walker, sent a letter to counsel for Oceaneering advising Oceaneering that MacPhail was going to travel to the United States in mid-January 2002 for further treatment and independent medical examinations ("IMEs"). The IMEs were scheduled or around February 1, 2002. The letter suggested that the Parties schedule depositions during Mac-Phail's visit to the United States and inquired as to whether Oceaneering was amenable to mediating the lawsuit during that time. Oceaneering's counsel responded to Walker's letter on January 2, 2002. In its response, Oceaneering indicated its desire to arrange IMEs for MacPhail and to schedule his deposition while he was present in the United States.

On January 9, 2002, just days before MacPhail was scheduled to depart for the United States, Oceaneering, Oceaneering International Party Limited and Oceaneering Australia Party Limited filed a Writ of Summons in the Supreme Court of Australia seeking specific performance of the Release. The Writ commanded MacPhail to make an appearance in the Australian forum within ten days. Consequently, Mac-Phail filed the instant Motion to Enjoin on January 28, 2002. In his Motion, Mac-Phail contends that Oceaneering filed the Australian lawsuit to "effectively circumscrib[e] this Court's jurisdiction, and once again, interfer[e] with Plaintiff's medical treatment."

## II.

Federal district courts have the power to issue anti-suit injunctions that enjoin persons over which they have *in personam* jurisdiction from prosecuting foreign suits. *See Kaepa, Inc. v. Achilles Corp.*, 76 F.3d 624, 626 (5th Cir.1996) ("It is well-settled among the circuit courts-including this one-which have reviewed the grant of an antisuit injunction that federal courts have the power to enjoin persons subject to their jurisdiction from prosecuting foreign suits."); *Gau Shan Co., Ltd. v. Bankers Trust Co.*, 956 F.2d 1349, 1352 (6th Cir.1992) ("It is well-settled that American courts have the power to control persons subject to their jurisdiction to the extent of forbidding them to sue in foreign jurisdictions."); *Allendale Mut. Ins. Co. v. Bull Data Sys., Inc.*, 10 F.3d 425, 431 (7th Cir.1993) ("Courts of equity have long issued injunctions against the use of litigation, including litigation in foreign courts, not to obtain a decision on the merits but to harass a party."). The Fifth Circuit, along with the Seventh and Ninth Circuits,

follows the "liberal approach" to anti-suit injunctions. *See Younis Brothers & Co., Inc. v. CIGNA Worldwide Ins. Co.,* 167 F.Supp.2d 743, 745–46 (E.D.Pa.2001) (comparing the "liberal approach" adopted by the Fifth, Seventh and Ninth Circuits with the "restrictive approach" followed by the D.C., Second and Sixth Circuits); *General Elec. Co. v. Deutz AG,* 129 F.Supp.2d 776, 783 (W.D.Pa.2000) (same). This "liberal approach" to anti-suit injunctions places minimal importance on international comity and holds that a court may enjoin a foreign proceeding if that parallel proceeding is vexatious and duplicative. *See Kaepa,* 76 F.3d at 626 (explaining that "the need to prevent vexatious and oppressive litigation" is of paramount importance when considering anti-suit injunctions and declining to "require a district court to genuflect before a vague and omnipotent notion of comity every time that it must decide whether to enjoin a foreign action."); *see also Bethell v. Peace,* 441 F.2d 495, 498 (5th Cir.1971).

■■■ A district court does not abuse its discretion by issuing an antisuit injunction if the court initially determines "that allowing simultaneous prosecution of the same action in a foreign forum thousands of miles away would result in inequitable hardship and tend to frustrate and delay the speedy and efficient determination of the cause." *Kaepa,* 76 F.3d at 627 (citations omitted). Put another way, if "prosecution of the foreign action would entail 'an absurd duplication of effort' and would result in unwarranted inconvenience, expense and vexation," a district court is free to enjoin a party from taking any further steps towards prosecuting the foreign action. *Id.* (citing *Allendale,* 10 F.3d at 430–31). In the past, courts have deemed anti-suit injunctions against foreign litigation appropriate where foreign litigation would (1) frustrate a public policy of the forum issuing the injunction; (2) be vexatious or oppressive; (3) threaten the court's *in rem*

or *quasi in rem* jurisdiction; or (4) prejudice other equitable considerations. *See In re Unterweser Reederei Gmbh,* 428 F.2d 888, 896 (5th Cir.1970), *aff'd on rehearing en banc,* 446 F.2d 907 (1971), *rev'd on other grounds sub nom. M/S Bremen v. Zapata Off–Shore Co.,* 407 U.S. 1, 92 S.Ct. 1907, 32 L.Ed.2d 512 (1972).

The Fifth Circuit's most recent discussion of propriety of an anti-suit injunction is found in its *Kaepa* decision. That case involved a distribution agreement between a U.S. company (Kaepa) and a Japanese entity (Achilles) providing that Achilles would market Kaepa's product (athletic shoes) in Japan. *See id.* at 625. After deciding that Achilles had breached the agreement, Kaepa sued Achilles in Texas state court. *See id.* at 626. Achilles subsequently removed the action to federal court and discovery commenced. *Id.* When Achilles later brought suit against Kaepa in a Japanese court asserting similar claims, Kaepa asked the district court to enjoin Achilles's Japanese lawsuit. *Id.* The district court complied with Kaepa's request and issued the injunction. *Id.*

On appeal, Achilles argued that the lower court overlooked comity concerns in granting the injunction. *Id.* The Fifth Circuit rejected Achilles's contention and concluded that the lower court's decision in no way "trampled on notions of international comity" because "no public international issue is implicated by the case: Achilles is a private party engaged in a contractual dispute with another private party. Second, the dispute has been long and firmly ensconced within the confines of the United States judicial system: Achilles consented to jurisdiction in Texas, stipulated that Texas law and the English language would govern any dispute; appeared in an action brought in Texas; removed that action to federal court; engaged in extensive discovery pursuant to the directives of

a federal court; and only then, with the federal action moving steadily toward trial, brought identical claims in Japan." *Id.* at 627. Furthermore, the Court emphasized that "Achilles's belated ploy of filing as putative plaintiff in Japan the very same claims against Kaepa that Kaepa had filed as plaintiff against Achilles smacks of cynicism, harassment and delay." *Id.* at 627–28. Accordingly, the Fifth Circuit held that "the district court did not abuse its discretion by granting Kaepa's motion for an antisuit injunction." *Id.* at 628.

### III.

■ Under the Fifth Circuit's reasoning in *Kaepa*, the issuance of an antisuit injunction in the instant suit would likewise fail to offend notions of international comity. First, as in *Kaepa*, no public international issue is implicated in this action. MacPhail is a private individual engaged in a dispute with a private corporation. Second, as in *Kaepa*, this action has been under the governance of the United States judicial system for a substantial time period (over nine months), the defendant is indisputably subject to this Court's personal jurisdiction and the parties have engaged in discovery pursuant to this Court's directives as the action has moved uninterrupted towards trial. Furthermore, the defendant in this action (Oceaneering) is an *American* corporation headquartered in this District. This fact suggests that an antisuit injunction is even less controversial here than in *Kaepa* (where the party to be enjoined was Japanese). The Court finds it inconceivable that enjoining an American corporation from pursuing this particular private action in Australia would have a detrimental effect on United States–Australia relations.

■ Next, leaving comity considerations aside, the Court turns to the more central concerns of the Fifth Circuit's approach to antisuit injunctions, namely vexatiousness and duplicitous litigation.

First, without a doubt, requiring MacPhail to litigate the validity of the Release in both Australia and the United States would result in duplicitous litigation, as well as unnecessary expense, inconvenience and nuisance. Moreover, any inconvenience to MacPhail is appreciably magnified by the fact that he is egregiously and dreadfully injured. Given MacPhail's present physical condition, any delay at all in the determination of his cause is ostensibly inequitable. Second, by seeking an Australian court order requiring specific performance of the Release, Oceaneering is making a back-door maneuver to deprive MacPhail of his day in court and to bring about the enforcement of a forum selection clause that this Court has already deemed contrary to public policy. This attempt to evade this forum's public policy and the directives contained within a prior Order of this Court must cease. Third, Oceaneering's ploy of filing suit against MacPhail in Australia just days before he was scheduled to travel to the United States for medical treatment "smacks of cynicism, harassment and delay." *Kaepa*, 76 F.3d at 628. Indeed, against the backdrop of Oceaneering's incomprehensibly deceitful and imperious withholding of not only vital medical care, but even vital medical *information*, this crass tactic borders on the criminal. Oceaneering waited *months* before it attempted to litigate the validity of the Release in Australia and, at the time it instituted the Australian action, Oceaneering was in receipt of this Court's lengthy opinion rendering the forum selection clause contained in the Release unenforceable. Lastly, Oceaneering filed suit against MacPhail on the eve of his visit to the United States-with full knowledge that filing an Australian suit at that time would interfere with his plans to receive much needed medical treatment and evaluation by his American physicians. Such timing

cannot be deemed fortuitous. Rather, it seems that Oceaneering made a calculated and cold-blooded attempt to interrupt MacPhail's journey to the United States, and to deny him any opportunity whatsoever to physically recover.

The Court cannot emphasize enough how ghastly and utterly callous Oceaneering has acted with regard to MacPhail. In fact, the evidence before the Court suggests that vexation and harassment of a severely injured plaintiff is the primary purpose, and possibly the sole purpose, of the foreign litigation at issue. Oceaneering's conduct rises to a level of harassment exponentially more abhorrent than the conduct of Achilles, which the Fifth Circuit refused to condone in *Kaepa*. As such, the Court concludes that the Fifth Circuit's "liberal approach" to antisuit injunctions, as outlined in *Kaepa*, fully supports the issuance of an injunction in this case. Accordingly, MacPhail's Motion to Enjoin is hereby **GRANTED** and Oceaneering is hereby **ENJOINED** from further prosecuting any action against MacPhail in Australia or any other forum.[2] Furthermore, in light of the above discussion, the Court concludes that Oceaneering's Motion for Reconsideration of its Motion to Dismiss is hereby emphatically **DENIED.**

IT IS SO ORDERED.

---

**2.** The Court notes that because it does not have personal jurisdiction over Oceaneering International Party Limited (a Singaporean entity) or Oceaneering Australia Party Limited (an Australian entity), this Order in no way purports to enjoin those two entities from pursuing an Australian action against Mac-Phail. Rather, this Order pertains solely to Oceaneering.