# United States Court of Appeals
## For the First Circuit

No. 03-2704

HANS A. QUAAK ET AL.,

Plaintiffs, Appellees,

v.

KLYNVELD PEAT MARWICK GOERDELER BEDRIJFSREVISOREN,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Patti B. Saris, U.S. District Judge]
[Hon. Robert B. Collings, U.S. Magistrate Judge]

Before

Selya and Lipez, Circuit Judges,

and DiClerico,* District Judge.

Ira M. Feinberg, with whom George A. Salter, John A. Redmon, Nicholas W.C. Corson, Hogan & Hartson LLP, Michael J. Stone, and Posternak Blankstein & Lund LLP were on brief, for appellant.
Glen DeValerio, with whom Jeffrey C. Block, Berman DeValerio Pease Tabacco Burt & Pucillo, Steven E. Cauley, Curtis L. Bowman, Cauley Geller Bowman Coates & Rudman, LLP, Lee S. Shalov, James Bonner, Patrick L. Rocco, Shalov Stone & Bonner LLP, Gregory P. Joseph, Gregory P. Joseph Law Offices LLC, Steven Singer, Erik Sandstedt, Bernstein Litowitz Berger & Grossmann LLP, Jack R. Pirozzolo Professional Corporation, Willcox, Pirozzolo & McCarthy, Terrence K. Ankner, Partridge Ankner & Horstmann LLP, Karen C. Dyer, and Boies Schiller & Flexner were on brief, for appellees.

March 8, 2004

_____
*Of the District of New Hampshire, sitting by designation.

**SELYA**, <u>Circuit Judge</u>.  It is widely thought that "[n]o aspect of the extension of the American legal system beyond the territorial frontier of the United States has given rise to so much friction as the requests for documents in investigation and litigation in the United States."  Restatement (Third) of Foreign Relations Law of the United States § 442, reporters' note 1 (1987).  As the imperatives of transnational business shrink the size of the globe, the task of devising an effective yet respectful paradigm for easing this friction becomes more and more urgent.  The instant appeal brings the titration into full focus.

The genesis of the problem in this case lies with an auditing engagement accepted by Klynveld Peat Marwick Goerdeler Bedrijfsrevisoren (KPMG-B), a Belgian firm that served as the auditor for a publicly-traded company, Lernout & Hauspie Speech Products, N.V. (L&H).  L&H's collapse precipitated a flood of actions against KPMG-B and others in the courts of this country, alleging massive securities fraud.  KPMG-B refused to produce relevant auditing records and associated work papers, asserting that to do so would violate Belgian law.  A magistrate judge rejected this assertion and ordered production.  <u>See</u> <u>In re Lernout & Hauspie Sec. Litig.</u>, 218 F.R.D. 348 (D. Mass. 2003) (<u>L&H III</u>).

In response, KPMG-B repaired to a Belgian court requesting that substantial penalties be imposed on those who might "take any step of a procedural or other nature in order to proceed

with the discovery-procedure."  The plaintiffs in the pending American litigation (who had obtained the turnover order in the first instance) implored the district court to enjoin KPMG-B from pursuing the Belgian action.  The district court obliged.  See In re Lernout & Hauspie Sec. Litig., 2003 WL 22964378, at *2 (D. Mass. Dec. 12, 2003) (L&H IV).[1]  KPMG-B immediately appealed.  We issued a partial stay of the antisuit injunction and expedited the appeal. We now affirm the district court's order.

## I.  BACKGROUND

As said, this appeal arises out of a welter of cases having a common theme:  the allegation that KPMG-B and others perpetrated large-scale securities fraud leading to L&H's collapse. Those cases include several class actions.  Some of them were commenced in the United States District Court for the District of Massachusetts and others were transferred to that district.  See, e.g., Filler v. Lernout, 2002 WL 227079 (D. Del. Feb. 8, 2002). The district court has consolidated all the cases.  It would serve no useful purpose to dissect the plaintiffs' allegations, and we urge the reader who thirsts for more detailed background knowledge to consult the district court's published opinions.  See, e.g., In re Lernout & Hauspie Sec. Litig., 230 F. Supp. 2d 152 (D. Mass.

---

[1]The district court accepted, adopted, and elaborated upon the report and recommendation of the magistrate judge.  For simplicity's sake, we do not distinguish between the two judicial officers, but, rather, take an institutional view and refer to the determinations below as those of the district court.

-3-

2002) (L&H II); In re Lernout & Hauspie Sec. Litig., 214 F. Supp. 2d 100 (D. Mass. 2002) (L&H I). We rehearse here only those developments needed to frame the issues on appeal.

KPMG-B is a target of an ongoing criminal investigation in Belgium, which arises out of the L&H fiasco. It is also a principal defendant in the aforedescribed securities fraud litigation. KPMG-B has not disputed the district court's in personam jurisdiction. It did seek to secure dismissal of the securities fraud litigation on forum non conveniens grounds, but failed in that effort. See L&H II, 230 F. Supp. 2d at 176. At the same time, the district court determined that the consolidated complaint against KPMG-B satisfied the stringent pleading requirements of the Private Securities Litigation Reform Act of 1995 (PSLRA), 15 U.S.C. § 78u-4(b)(2), and Federal Rule of Civil Procedure 9(b). L&H II, 230 F. Supp. 2d at 165-66.

Once past these threshold issues, the securities fraud plaintiffs embarked on pretrial discovery. In September of 2002, they served document requests for KPMG-B's work papers. See Fed. R. Civ. P. 34. The plaintiffs did not get very far; KPMG-B refused to comply with the requests, asseverating that Belgian law prohibited it from divulging the information sought. While this game of cat and mouse was taking place, the plaintiffs, acting on KPMG-B's advice, became civil co-prosecutors in the ongoing Belgian criminal investigation. Through this participation, they were able

to examine all the documents that were not deemed confidential by the Belgian prosecutor, but they were not permitted to copy documents for use in the securities fraud litigation.

Tantalized by their glimpse of the work papers, the securities fraud plaintiffs moved to compel their production. A magistrate judge took briefing and heard argument on the applicability of and exceptions to the Belgian secrecy law.[2] On November 13, 2003, he rejected KPMG-B's arguments and ordered production of the work papers on or before the close of business on December 1, 2003.

On November 27, 2003 — Thanksgiving day — KPMG-B filed an ex parte petition with a court in Brussels, seeking to enjoin the securities fraud plaintiffs from "taking any step" to proceed with the requested discovery. To ensure compliance, they asked the Belgian court to impose a fine of one million Euros for each violation of the proposed injunction.[3] The Belgian court

---

[2]The parties agree that, as a general matter, Article 458 of the Belgian Criminal Code prohibits auditors from disclosing confidential client information. There are, however, numerous exceptions to that general proscription. The parties have differing views as to whether KPMG-B's disclosure of its work papers pursuant to the district court's turnover order would (or would not) fall within any one of these exceptions.

[3]In pertinent part, KPMG-B's petition asked the Belgian court for the following:

> To prohibit defendants, upon forfeitment of a penalty of 1.000.000 EUR per infraction by each defendant, to take any step of a procedural or other nature in order to proceed

refused to act ex parte; instead, it directed that notice be provided to the securities fraud plaintiffs and scheduled a hearing for December 16, 2003. On December 1, KPMG-B gave notice of the institution of the Belgian action to the securities fraud plaintiffs. It also filed an objection to the magistrate judge's recommended decision. That objection is still pending in the district court (there is, among other things, a disagreement as to its timeliness). Finally, KPMG-B moved to stay the turnover order.

Faced with the threat of extravagant fines, the securities fraud plaintiffs sought the district court's protection. On December 9, the magistrate judge issued a report and recommendation urging the entry of an order enjoining KPMG-B from proceeding with its Belgian action. The district judge held a hearing two days later and issued an antisuit injunction, the full text of which is reproduced below:

---

with the discovery-procedure, initiated by them in the framework of the aforementioned American procedures, including but not limited to:
1. taking any step of a procedural or other nature in order to execute or rely on the decision of the District Court of Massachusetts dated 13 November 2003 to produce the audit working papers;
2. taking any step of a procedural or other nature in the framework of the order of the American judge in its decision of 13 November 2003 to meet and confer with Petitioner concerning the production of the requested documents . . . .

> The Court preliminarily enjoins KPMG-Belgium
> from proceeding with its writ, orders KPMG-
> Belgium to withdraw forthwith its writ in the
> Court of First Instance of Brussels and orders
> it not to proceed with the hearing scheduled
> on December 16, 2003. KPMG-Belgium shall file
> proof of compliance with this order.

L&H IV, 2003 WL 22964378, at *2. Hot on the heels of this order, the magistrate judge denied KPMG-B's motion to stay the turnover order, branding that motion untimely. In re Lernout & Hauspie Sec. Litig., 219 F.R.D. 28, 30-31 (D. Mass. 2003) (L&H V). KPMG-B immediately appealed the entry of the antisuit injunction. We granted a limited stay of the injunction, permitting KPMG-B to appear at the December 16 hearing in Brussels for the sole purpose of requesting a continuance. The Belgian court has been fully cooperative, and the foreign action has been continued periodically during the pendency of this expedited appeal. There has been no further action with regard to the turnover order itself.

## II.  STANDARD OF REVIEW

A grant of a preliminary injunction typically receives deferential review. McGuire v. Reilly, 260 F.3d 36, 42 (1st Cir. 2001). The trial court's order will stand unless it "mistook the law, clearly erred in its factual assessments, or otherwise abused its discretion in granting the interim relief." Id. In our view, however, international antisuit injunctions — which involve important considerations of comity — warrant a heightened level of appellate review. Cf. United States v. O'Brien, 895 F.2d 810, 814

-7-

(1st Cir. 1990) (considering the importance of the interest at stake when ascertaining the appropriate standard of review). Consequently, we deem it appropriate to conduct an independent review of the justification for the issuance of an international antisuit injunction. This is an "intermediate level of scrutiny, more rigorous than the abuse-of-discretion or clear-error standards, but stopping short of plenary or de novo review." United States v. Tortora, 922 F.2d 880, 883 (1st Cir. 1990). Given our chosen standard of review, we cede a modest degree of deference to the trier's exercise of discretion, but "we will not hesitate to act upon our independent judgment if it appears that a mistake has been made." El Dia, Inc. v. Hernandez Colon, 963 F.2d 488, 492 (1st Cir. 1992).

## III.  ANALYSIS

Determining the appropriateness of an international antisuit injunction is a highly nuanced exercise. An inquiring court must find a way to accommodate conflicting, mutually inconsistent national policies without unduly interfering with the judicial processes of a foreign sovereign. See Laker Airways Ltd. v. Sabena, Belgian World Airlines, 731 F.2d 909, 916 (D.C. Cir. 1984). This task is particularly formidable given the absence of guidance from the Supreme Court and the paucity of precedent in this circuit; the Justices have not spoken to the criteria for granting an international antisuit injunction and this court has

passed on that question only once (and then, glancingly).  See Canadian Filters (Harwich) Ltd. v. Lear-Siegler, Inc., 412 F.2d 577 (1st Cir. 1969).  We begin our analysis by articulating the standards that ought to govern the question.  We then apply those standards to the case at hand.

### A.  **Articulating the Standards**.

It is common ground that federal courts have the power to enjoin those subject to their personal jurisdiction from pursuing litigation before foreign tribunals.  See, e.g., Kaepa, Inc. v. Achilles Corp., 76 F.3d 624, 626 (5th Cir. 1996); China Trade & Dev. Corp. v. M.V. Choong Yong, 837 F.2d 33, 35 (2d Cir. 1987). The exercise of that power must be tempered, however, by the accepted proposition that parallel proceedings on the same in personam claim generally should be allowed to proceed simultaneously.  Laker Airways, 731 F.2d at 926.  The decisional calculus must take account of this presumption in favor of concurrent jurisdiction.  It also must take account of considerations of international comity.  After all, even though an international antisuit injunction operates only against the parties, it effectively restricts the jurisdiction of a foreign sovereign's courts.  See, e.g., China Trade, 837 F.2d at 35-36.

Federal courts have been consentient in endorsing these principles.  Beyond that point, however, the waters grow murky. The courts of appeals have differed as to the legal standards to be

-9-

employed in determining whether the power to enjoin an international proceeding should be exercised. Two basic views have emerged. For ease in reference, we shall call the more permissive of these views the liberal approach and the more restrictive of them the conservative approach. See Note, Antisuit Injunctions and International Comity, 71 Va. L. Rev. 1039, 1049-51 (1985) (using this nomenclature).

The liberal approach has been championed by two courts of appeals: the Fifth Circuit, Kaepa, 76 F.3d at 627, and the Ninth Circuit, Seattle Totems Hockey Club, Inc. v. Nat'l Hockey League, 652 F.2d 852, 855-56 (9th Cir. 1981). In addition, the Seventh Circuit has pronounced itself "incline[d] toward" the liberal view. Philips Med. Sys. Int'l v. Bruetman, 8 F.3d 600, 605 (7th Cir. 1993). Under this approach, an international antisuit injunction is appropriate whenever there is a duplication of parties and issues and the court determines that the prosecution of simultaneous proceedings would frustrate the speedy and efficient determination of the case. Kaepa, 76 F.3d at 627; Seattle Totems, 652 F.2d at 856. We do not mean to suggest that courts employing the liberal approach do not give weight to considerations of international comity. For the most part, they do — but they tend to define that interest in a relatively narrow manner and to assign it only modest weight. See, e.g., Kaepa, 76 F.3d at 627 (noting

-10-

that an international antisuit injunction does not "actually threaten relations" between the two involved nations).

Four courts of appeals have espoused the conservative approach for gauging the propriety of international antisuit injunctions. See Stonington Partners, Inc. v. Lernout & Hauspie Speech Prods., 310 F.3d 118, 126 (3d Cir. 2002); Gau Shan Co. v. Bankers Trust Co., 956 F.2d 1349, 1355 (6th Cir. 1992); China Trade, 837 F.2d at 36 (2d Cir.); Laker Airways, 731 F.2d at 927 (D.C. Cir.). Under this approach, the critical questions anent the issuance of an international antisuit injunction are whether the foreign action either imperils the jurisdiction of the forum court or threatens some strong national policy. See, e.g., Stonington Partners, 310 F.3d at 127; China Trade, 837 F.2d at 36. This approach accords appreciably greater weight to considerations of international comity.

We reject the liberal approach. We deem international comity an important integer in the decisional calculus — and the liberal approach assigns too low a priority to that interest. In the bargain, it undermines the age-old presumption in favor of concurrent parallel proceedings — a value judgment that leaves us uneasy — and presumes that public policy always favors allowing a suit pending in an American court to go forward without any substantial impediment. To cinch matters, this approach gives far too easy passage to international antisuit injunctions. We

-11-

understand that the judicial process is a cornerstone of the American way of life — but in an area that raises significant separation of powers concerns and implicates international relations, we believe that the law calls for a more cautious and measured approach.

The conservative approach has more to commend it. First, it recognizes the rebuttable presumption against issuing international antisuit injunctions (and, thus, honors the presumption favoring the maintenance of parallel proceedings). Second, it is more respectful of principles of international comity. Third, it compels an inquiring court to balance competing policy considerations. Last — but far from least — it fits snugly with the logic of Canadian Filters, in which we said that issuing an international antisuit injunction is a step that should "be taken only with care and great restraint" and with the recognition that international comity is a fundamental principle deserving of substantial deference. 412 F.2d at 578.

We stop short, however, of an uncritical acceptance of the conservative approach. The recent expositions of that approach have come to regard the two main rationales upon which international antisuit injunctions may be grounded — preservation of jurisdiction and protection of important national policies — as exclusive. See, e.g., Gen. Elec. Co. v. Deutz AG, 270 F.3d 144, 160-61 (3d Cir. 2001) (describing these as the "only"

-12-

justifications that can support the issuance of such an injunction); Gau Shan, 956 F.2d at 1355 (similar). We are uncomfortable with this gloss, for it evinces a certain woodenness. In our view, the sensitive and fact-specific nature of the inquiry counsels against the use of inflexible rules.

We therefore reject this reworking of the conservative approach and instead endorse its traditional version. That version is not only more flexible but also more consistent with Laker Airways — which we regard as the seminal opinion in this field of law. The Laker Airways court did not suggest that its two stated rationales were the only ones that could justify issuing an international antisuit injunction. 731 F.2d at 927 (noting that "[i]njunctions are most often necessary" to protect the court's jurisdiction or to prevent evasion of the nation's important policies). Rather, the court indicated that it was prudent to use a wider-angled lens, making clear that the equitable considerations surrounding each request for an injunction should be examined carefully. Id.

In order to provide guidance for the district courts, we spell out the manner in which our preferred approach operates. The gatekeeping inquiry is, of course, whether parallel suits involve the same parties and issues. Unless that condition is met, a court ordinarily should go no further and refuse the issuance of an international antisuit injunction. See, e.g., China Trade, 837

-13-

F.2d at 36; <u>Laker Airways</u>, 731 F.2d at 928; <u>see</u> <u>also</u> George A. Bermann, The Use of Anti-Suit Injunctions in International Litigation, 28 Colum. J. Transnat'l L. 589, 626 (1990) (stating that courts generally "will not consider issuing anti-suit injunctions" unless there are "parallel local and foreign actions between the same parties over the same claim"). If — and only if — this threshold condition is satisfied should the court proceed to consider all the facts and circumstances in order to decide whether an injunction is proper. In this analysis, considerations of international comity must be given substantial weight — and those considerations ordinarily establish a rebuttable presumption against the issuance of an order that has the effect of halting foreign judicial proceedings.

We acknowledge that the task of determining when a litigant has overcome this presumption is a difficult one. That is partly because comity is an elusive concept. The Supreme Court has defined it as "the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens or of other persons who are under the protection of its laws." <u>Hilton</u> v. <u>Guyot</u>, 159 U.S. 113, 164 (1895). Judge Aldrich trenchantly described it as "a blend of courtesy and expedience." <u>Canadian Filters</u>, 412 F.2d at 578. Whatever definition is employed, it is

-14-

pellucid that comity is not a matter of rigid obligation, but, rather, a protean concept of jurisdictional respect. And to complicate matters, comity, like beauty, sometimes is in the eye of the beholder.

We hasten to add that although the definition of comity may be tenebrous, its importance could not be more clear. In an increasingly global economy, commercial transactions involving participants from many lands have become common fare. This world economic interdependence has highlighted the importance of comity, as international commerce depends to a large extent on "the ability of merchants to predict the likely consequences of their conduct in overseas markets." Gau Shan, 956 F.2d at 1355. This predictability, in turn, depends on cooperation, reciprocity, and respect among nations. That helps to explain the enduring need for a presumption — albeit a rebuttable one — against the issuance of international antisuit injunctions.

In the final analysis, rebutting this presumption involves a continual give and take. In the course of that give and take, the presumption may be counterbalanced by other facts and factors particular to a specific case. These include (but are by no means limited to) such things as: the nature of the two actions (i.e., whether they are merely parallel or whether the foreign action is more properly classified as interdictory); the posture of the proceedings in the two countries; the conduct of the parties

-15-

(including their good faith or lack thereof); the importance of the policies at stake in the litigation; and, finally, the extent to which the foreign action has the potential to undermine the forum court's ability to reach a just and speedy result.

Seen in this light, we agree that either the preservation of jurisdiction or the safeguarding of important national policies may afford a sufficient basis for the issuance of an international antisuit injunction. We do not, however, attach talismanic significance to concepts such as jurisdiction-stripping and insults to public policy. Instead, we hold that in every case a district court should examine the totality of the circumstances in deciding whether a particular case warrants the issuance of an international antisuit injunction. See Laker Airways, 731 F.2d at 927 ("There are no precise rules governing the appropriateness of antisuit injunctions."). If, after giving due regard to the circumstances (including the salient interest in international comity), a court supportably finds that equitable considerations preponderate in favor of relief, it may issue an international antisuit injunction.

### B. **Applying the Standards**.

Against this backdrop, we ponder whether the district court acted within the realm of its discretion when it enjoined KPMG-B from pursuing the Belgian litigation. We conclude that it did.

The lower court applied the traditional four-part test for preliminary injunctions. See, e.g., Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 102 F.3d 12, 15 (1st Cir. 1996) (describing the four-part test). Because this generic algorithm provides an awkward fit in cases involving international antisuit injunctions, district courts have no obligation to employ it in that context. See Stonington Partners, 310 F.3d at 129. Here, however, any methodological error was harmless: the district court, as part of its inquiry, carefully considered all of the critical factors.

We need not belabor the obvious. The parties and issues are substantially similar, thus satisfying the gatekeeping inquiry. The district judge acknowledged the importance of comity concerns in her published opinion. See L&H IV, 2003 WL 22964378, at *2. A reading of the hearing transcript leaves no doubt that she was fully aware of the potential ramifications with respect to international comity and that she gave heavy weight to those concerns. However, she placed on the opposite pan of the scale the character of the foreign action, the public policy favoring the safeguarding of investors from securities fraud, the need to protect the court's own processes, and the balance of the equities. Id. at *1-*2. In the end, the court determined that those factors counterbalanced comity concerns in the peculiar circumstances of this case. Id. at *2. Having conducted an independent review, we find that determination fully supportable.

The essential character of the Belgian action is easily discerned. In it, KPMG-B seeks to impose huge financial penalties on the securities fraud plaintiffs should they take any steps to enforce the district court's turnover order. This attempt to chill legitimate discovery by in terrorem tactics can scarcely be viewed as anything but an effort to "quash the practical power of the United States courts." Laker Airways, 731 F.2d at 938; see United States v. Davis, 767 F.2d 1025, 1029 (2d Cir. 1985) (upholding injunction of foreign proceeding where the "sole purpose" of instituting that proceeding "was to block compliance with a legitimate trial subpoena"). Thus, the foreign action is plainly interdictory in nature.

Where, as here, a party institutes a foreign action in a blatant attempt to evade the rightful authority of the forum court, the need for an antisuit injunction crests. See Laker Airways, 731 F.2d at 929-30. Fairly read, KPMG-B's petition to the Belgian tribunal seeks to arrest the progress of the securities fraud action by thwarting the very discovery that the district court, which is intimately familiar with the exigencies of the underlying case, has deemed essential to the continued prosecution of the action against any of the defendants. In technical terms, this may not constitute a frontal assault on the district court's jurisdiction, but the practical effect is the same. That is a matter of considerable import: a court has a right — indeed, a

-18-

duty — to preserve its ability to do justice between the parties in cases that are legitimately before it. See id. at 930; see also Davis, 767 F.2d at 1039 (upholding an antisuit injunction as "necessary to ensure a complete adjudication of the matter before it").

The equities also counsel in favor of affirming the district court's order. This is not a case in which a trial court is enabling a fishing expedition. The securities fraud plaintiffs have survived the PSLRA's heightened pleading requirements and, moreover, they have actually seen the documents that they seek. Consequently, they know that they are not fishing in an empty stream.

In weighing the equities, we also think it noteworthy that KPMG-B, not the securities fraud plaintiffs or the district court, set the stage for a crisis of comity. If KPMG-B had not filed a foreign petition calculated to generate interference with an ongoing American case, the district court would have had no need to issue a defensive injunction that sought only to preserve the court's ability to adjudicate the claims before it according to the law of the United States. And, finally, KPMG-B's actions are harder to accept because it had available to it other options for seeking resolution of its client confidentiality concerns. The most obvious choice was to pursue and exhaust its position in the federal judicial system before attempting to sidetrack that system.

Alternatively, it could have sought clarification from the Belgian courts without raising the stakes to a level that necessarily precipitated a direct conflict with the pending securities fraud action. It eschewed these options. Having called the tune, it hardly seems inequitable that KPMG-B must now pay the piper.

KPMG-B's remaining arguments need not occupy us for long. First, it posits that the district court erred when it entered the antisuit injunction prior to reviewing the magistrate judge's turnover order (including his assessment of the Belgian law issue). This argument is hopeless.

District courts have broad discretion in determining the sequence of their rulings. Cf. Dynamic Image Techs., Inc. v. United States, 221 F.3d 34, 38 (1st Cir. 2000) (noting trial court's substantial discretion in deciding when to rule upon particular motions). Here, moreover, KPMG-B left the district court no practical alternative. By electing to file its petition in Belgium before it lodged an objection to the magistrate judge's recommended decision, KPMG-B effectively dictated the sequence of subsequent events.

KPMG-B next contends that the lower court erred as a matter of law by failing to give due regard to the possible use of letters rogatory as a means of securing the requested documents. This contention lacks force.

-20-

While letters rogatory are among the discovery devices available in a federal court, parties are not required to resort to them come what may. See Société Nationale Industrielle Aérospatiale v. United States Dist. Court, 482 U.S. 522, 543-44 (1987). The transcripts of the relevant hearings make it crystal clear that, in this instance, the district court fully considered, and flatly rejected, the argument that letters rogatory would serve as a satisfactory substitute for a turnover order. Bearing in mind the district court's superior coign of vantage, we are loath to second-guess its pragmatic judgment. Under the best of circumstances, letters rogatory are burdensome, costly, and time-consuming. Id. at 542. For various reasons — including the fact that Belgium is not a signatory to the Hague Convention[4] — the circumstances here are far from ideal.

Nor can we accept KPMG-B's related contention that, as a matter of law, no international antisuit injunction can issue if the forum court's goal can be achieved in some other way. While we encourage trial courts to search out alternatives that might avoid the need to issue antisuit injunctions, we will not force them to

_____

[4]The Hague Convention provides a set of minimum standards for securing evidence across national borders. See Société Nationale, 482 U.S. at 532. American courts know that signatory nations are committed to comply with those standards (and, thus, with requests made in conformity therewith). Because Belgium is not a signatory to the Hague Convention, there is an added element of uncertainty as to whether (and if so, to what extent) the Belgian courts will honor requests via letters rogatory.

exhaust remote possibilities. Here, there is no compelling justification for overriding the district court's considered judgment that letters rogatory are not a reasonably equivalent alternative to the turnover order.

Finally, KPMG-B asserts that because the securities fraud plaintiffs will eventually gain access to the requested documents even in the absence of a turnover order, the injunction was improvidently issued. This assertion elevates hope over likelihood.

KPMG-B's thesis is, in substance, that the work papers will be made available by the Belgian prosecutor at the conclusion of the criminal investigation. But there is a rub: we have no reliable way of knowing when that investigation will end and, in all events, the record is unclear as to whether the outcome of the investigation will (or will not) affect the availability of the work papers. We do not think that a district court must bring the resolution of a case within its jurisdiction to a dead halt in the hope that the resolution of a foreign criminal proceeding at an uncertain future date may alleviate the need for a discovery order.

## IV. CONCLUSION

We do not mean to minimize the potential difficulty of the situation that KPMG-B faces. To some extent, however, that situation is the natural consequence of its decision to ply its wares in the lucrative American marketplace. Having elected to

-22-

establish a major presence in the United States, KPMG-B must have anticipated that it would be subject to suit in this country (and, thus, subject to pretrial discovery rules that are pandemic to the American justice system). See Restatement (Third) of Foreign Relations Law § 442, reporters' note 1 (1987) (noting "that persons who do business in the United States . . . are subject to the burdens as well as the benefits of United States law, including the laws on discovery"). While courts should "take care to demonstrate due respect for any special problem confronted by [a] foreign litigant on account of its nationality," Société Nationale, 482 U.S. at 546, a foreign national that chooses to engage in business in the United States likewise must demonstrate due respect for the operation of the American judicial system.

We need go no further. For the foregoing reasons, we hold that the district court acted within the encincture of its discretion in enjoining KPMG-B from pursuing its Belgian litigation. In the last analysis, an international antisuit injunction, like any other injunction, is an equitable remedy designed "to bring the scales into balance." Rosario-Torres v. Hernandez-Colon, 889 F.2d 314, 323 (1st Cir. 1989) (en banc). In this case, the district court acted defensively to protect its own authority from an interdictory strike and we are confident that, in doing so, the court kept the balance steady and true.

**We affirm the district court's injunction order and vacate the partial stay of that order previously issued by this court. Costs shall be taxed against the appellant.**