O'Brien v. TCG Consulting Partners, LLC, 2016 NCBC 25.

STATE OF NORTH CAROLINA

MECKLENBURG COUNTY

MARK O'BRIEN,

             Plaintiff,

v.

TCG CONSULTING PARTNERS, LLC;
TCG CONSULTING, LLC; ALBERT
TARAS; DENKIFURO LLC; TCG
CONSULTING CORPORATION;
VALENTINE FRENCH, LLC; and
JAMES GARZON,

             Defendants.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
15 CVS 20339

ORDER AND OPINION ON
PLAINTIFF'S MOTION TO ENJOIN
DUPLICATIVE FOREIGN ACTION

{1}    **THIS MATTER** is before the Court upon Plaintiff Mark O'Brien's ("Plaintiff" or "O'Brien") Motion to Enjoin Defendant TCG Consulting Partners, LLC ("TCG Partners") from Proceeding with Any Duplicative Foreign Action (the "Motion") in the above-captioned case.[1]

> *Gardner Skelton PLLC, by Jared E. Gardner and Tyler B. Peacock, for Plaintiff Mark O'Brien.*
>
> *Rayburn Cooper & Durham, P.A., by Ross R. Fulton and Benjamin E. Shook, for Defendant TCG Consulting Partners, LLC.*

Bledsoe, Judge.

{2}    Having considered the Motion, the briefs in support of and in opposition to the Motion, supporting documents, and the arguments of counsel at a March 3, 2016 hearing on this matter, the Court enters the following **FINDINGS OF FACT** and **CONCLUSIONS OF LAW**, for the limited purposes of deciding the Motion, as follows:

---

[1] Although O'Brien sought a permanent injunction in the Motion, O'Brien clarified in his reply brief that the Motion should be read to seek a preliminary, rather than a permanent, injunction at this stage of the litigation.

## FINDINGS OF FACT

### I.

### PROCEDURAL AND FACTUAL BACKGROUND

{3} This dispute arises out of TCG Partners' alleged wrongful termination of O'Brien's minority membership interest in TCG Partners. The Motion seeks an order enjoining TCG Partners from proceeding with a concurrent action in England advancing a claim similar to one of O'Brien's claims in this action.

{4} O'Brien is a citizen and resident of England and became a minority member of TCG Partners on August 1, 2011. (Compl. ¶ 1.) TCG Partners is a North Carolina limited liability company with its principal place of business in Charlotte, North Carolina and provides consulting services for corporate travel, meetings, payment, and expense management. (Compl. ¶¶ 2, 22.)

{5} On October 23, 2015, TCG Partners and its majority member and manager, Albert Taras ("Taras"), informed O'Brien that TCG Partners was "terminating [O'Brien's] agreement" with the company. O'Brien alleges that this termination was wrongful and took O'Brien completely by surprise. (Compl. ¶¶ 29, 47.)

{6} On October 30, 2015, after rejecting TCG Partners' effort to pay him $58,000 for his membership interest, O'Brien requested to inspect TCG Partners' books and records under N.C. Gen. Stat. § 57D-3-04 and commenced this lawsuit under N.C. R. Civ. P. 3(a) by the issuance of a summons and obtaining an order permitting him 20 days to file his complaint. (Compl. ¶ 52.)

{7} O'Brien filed his Complaint on November 19, 2015. The Complaint includes ten causes of action, the tenth of which is a claim for declaratory judgment in connection with an alleged promissory note signed by O'Brien and owed to TCG Partners (the "Alleged Promissory Note" or the "Note"). The Alleged Promissory Note relates to a lawsuit TCG Partners initiated in England against TCG Consulting Europe, Ltd. ("TCG Europe") and James Kingsley Drew ("Drew") to recover money allegedly owed to TCG Partners by TCG Europe and Drew (the "Drew Lawsuit"). (Compl. ¶ 118.) Drew had been a friend and former business associate of O'Brien, and O'Brien had introduced Drew to Taras and TCG Partners. (Compl. ¶ 118.) Taras

blamed O'Brien for TCG Partners' need to pursue the Drew Lawsuit and for the fees and expenses TCG Partners incurred in connection with the Drew Lawsuit. (Compl. ¶ 118.)

{8}     On March 19, 2014, Taras and O'Brien each signed the Alleged Promissory Note, which took the form of a print-out of an e-mail from Taras to O'Brien labeled "Promissory Note between TCGP and Mark O'Brien." The Note provided that O'Brien agreed "to repay any losses (costs) incurred by TCG Partners [in the Drew Lawsuit]" in an amount not greater than "~USD$196k,", plus TCG Partners' actual attorney's fees and interest costs associated with the Drew Lawsuit. (Compl. Ex. F.)

{9}     Taras also prepared and presented to the members of TCG Partners a PowerPoint slide titled "Mark Repayment Plan," which sets forth the amount and repayment terms of the Alleged Promissory Note. (Compl. Ex. G.) As represented on the PowerPoint slide, the original amount owed on the Alleged Promissory Note was approximately $142,000. On November 4, 2015, TCG Partners sent O'Brien a letter demanding payment of $115,553.68, which the company claimed was then due and owing on the Alleged Promissory Note. (Pl.'s Mot. Enjoin 4–5.) On November 16, 2015, TCG Partners sent O'Brien another letter, this time demanding $114,395.56 as the amount due and owing on the Note, and advised that if O'Brien failed to pay the amount demanded, TCG Partners would commence proceedings in England to recover the amount owed on the Note. (Pl.'s Mot. Enjoin 5.)

{10}     O'Brien denies that he owes anything on the Alleged Promissory Note, contending that the fees and costs incurred by TCG Partners in connection with the Drew Lawsuit are and always have been solely a liability of TCG Partners. For his tenth claim for relief, O'Brien seeks a declaratory judgment that he is not, and has never been, liable for the costs associated with the Drew Lawsuit or for any sums allegedly owed on the Note.

{11}     On December 22, 2015, TCG Partners initiated an action against O'Brien in England by serving O'Brien with a Claim Form from the High Court of Justice, Queen's Bench Division, London Mercantile Court, together with a document entitled

Particulars of Claim (the "English Action"). The English Action seeks to recover the amounts TCG Partners alleges O'Brien owes under the Alleged Promissory Note.

{12}    O'Brien filed this Motion on December 24, 2015, two days after TCG Partners filed the English Action, seeking to enjoin TCG Partners from proceeding with the English Action. The Motion has been fully briefed, the Court held a hearing on the Motion on March 3, 2016, and the Motion is now ripe for resolution.

## CONCLUSIONS OF LAW

### II.

### LEGAL STANDARD

{13}    As a general rule, a preliminary injunction is an extraordinary measure that will only be issued:

> (1) if a plaintiff is able to show *likelihood* of success on the merits of his case and (2) if a plaintiff is likely to sustain irreparable loss unless the injunction is issued or if, in the opinion of the Court, issuance is necessary for the protection of a plaintiff's rights during the course of litigation.

*A.E.P. Indus., Inc. v. McClure*, 308 N.C. 393, 401, 302 S.E.2d 754, 759–60 (1983) (quoting *Investors, Inc. v. Berry*, 293 N.C. 688, 701, 239 S.E.2d 566, 574 (1977)).

### III.

### ANALYSIS

{14}    The issue presented by this Motion is whether the Court should enjoin TCG Partners from proceeding with the English Action on the Alleged Promissory Note in the English court system. The parties' disagreement primarily concerns the legal standard that the Court should apply in deciding that issue and the application of that standard to the circumstances here.

{15}    The parties appear to agree, and the Court's research confirms, that there is no North Carolina state court decision squarely addressing what standard or rule a North Carolina court should apply to determine whether litigants over whom the state court has jurisdiction should be enjoined from proceeding in a court in a foreign country.

{16}    O'Brien argues that this case should be controlled by a federal district court decision issued in 1907 and eventually affirmed by the Fourth Circuit, *United Cigarette Machine Co. v. Wright*, 156 F. 244 (C.C.E.D.N.C. 1907), *aff'd*, 193 F. 1023 (4th Cir. 1912). That case involved two lawsuits: one in federal court in North Carolina, and one in England. The federal district court held:

> [I]t appears to be well established that courts of equity can, and in a proper case ought to and will, restrain litigants in a foreign court. . . . [It is] a duty of a court of equity to restrain litigants in a foreign state or country . . . where the matter is being fully litigated in the court to which the application for injunctive relief is made.

*Id.* at 246.

{17}    Although federal decisions interpreting North Carolina law may constitute persuasive authority for the Court's consideration, such decisions are not binding. *See, e.g.*, *Virmani v. Presbyterian Health Servs. Corp.*, 350 N.C. 449, 465, 515 S.E.2d 675, 686 (1999) (holding that Fourth Circuit decisions are not binding authority for state courts when addressing a question solely of state law). Moreover, the federal decision O'Brien advances here—applying federal law and issued over one hundred years ago when North Carolina's international commerce was limited and considerations of international comity[2] had not yet gained widespread judicial support—diminishes the persuasive authority the decision otherwise might have.

{18}    O'Brien also relies upon two North Carolina state court cases, *Childress v. Johnson Motor Lines, Inc.*, 235 N.C. 522, 70 S.E.2d 558 (1952), and *Staton v. Russell*, 151 N.C. App. 1, 565 S.E.2d 103 (2002). In *Childress*, the North Carolina Supreme Court held that a state court has the power to enjoin a party over which it has

---

[2] International comity is "the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens, or of other persons who are under the protection of its laws." *Hilton v. Guyot*, 159 U.S. 113, 164 (1895). Comity is a "term [that] 'summarizes in a brief word a complex and elusive concept—the degree of deference that a domestic forum must pay to the act of a foreign government not otherwise binding on the forum.'" *de Csepel v. Republic of Hung.*, 714 F.3d 591, 606 (D.C. Cir. 2013) (quoting *Laker Airways Ltd. v. Sabena, Belgian World Airlines*, 731 F.2d 909, 937 (D.C. Cir. 1984)). As one court has summarized, "[w]hatever definition is employed, it is pellucid that comity is not a matter of rigid obligation, but, rather, a protean concept of jurisdictional respect. And to complicate matters, comity, like beauty, sometimes is in the eye of the beholder." *Quaak v. Klynveld Peat Marwick Goerdeler Bedrijfsrevisoren*, 361 F.3d 11, 19 (1st Cir. 2004).

jurisdiction from proceeding with an action in another state. *Childress*, 235 N.C. at 531, 70 S.E.2d at 564. Similarly, in *Staton*, the Court of Appeals upheld a trial court's anti-suit injunction prohibiting certain parties from proceeding with a similar Florida action that was filed three years after the first suit was filed in North Carolina state court. O'Brien argues that, under *Childress* and *Staton*, this Court should enjoin TCG Partners from proceeding in the English Action if the Court finds the English Action to be duplicative and vexatious. As TCG Partners points out, however, these decisions involve a North Carolina state court enjoining a party from litigating in another state court, not in the court of a foreign nation. Because North Carolina's appellate courts have not addressed the specific issue presented here—under what circumstances a North Carolina state court should enjoin litigants in a foreign nation's court—the Court looks to federal case law and the law of other states for guidance.

{19}   In contrast to requests for domestic anti-suit injunctions, federal and state courts often apply a different and more rigorous standard to requests for international anti-suit injunctions. *See, e.g., Philips Med. Sys. Int'l B.V. v. Bruetman*, 8 F.3d 600, 604 (7th Cir. 1993) (describing "the respect that sovereign nations (or quasisovereigns such as the states of the United States) owe each other"). The well-established rule among the federal appellate courts is that "courts have the power to enjoin persons subject to their jurisdiction from prosecuting foreign suits." *Kaepa, Inc. v. Achilles Corp.*, 76 F.3d 624 (5th Cir. 1996). The "exercise of that power must be tempered, however, by the accepted proposition that parallel proceedings on the same in personam claim generally should be allowed to proceed simultaneously." *Quaak*, 361 F.3d at 16.

{20}   Indeed, it has long been held that "when two sovereigns have concurrent in personam jurisdiction one court will ordinarily not interfere with or try to restrain proceedings before the other." *China Trade & Dev. Corp. v. M.V. Choong Yong*, 837 F.2d 33, 36 (2d Cir. 1987). "Parallel proceedings on the same in personam claim should ordinarily be allowed to proceed simultaneously, at least until a judgment is reached in one which can be pled as res judicata in the other." *Laker Airways*, 731

F.2d at 926–27 (quotations and citations omitted). As a result, "the decisional calculus [for an international anti-suit injunction] must take account of this presumption in favor of concurrent jurisdiction." *Quaak*, 361 F.3d at 16–17. "It also must take account of considerations of international comity. After all, even though an international anti-suit injunction operates only against the parties, it effectively restricts the jurisdiction of a foreign sovereign's courts." *Id.* at 17. As a result, "an anti-foreign-suit injunction should be used sparingly, and should be granted only with care and great restraint." *China Trade*, 837 F.2d at 35–36 (quotations and citations omitted).

{21}  The federal circuit courts have generally applied one of two legal standards in determining whether the power to enjoin an international proceeding should be exercised. O'Brien advocates for the so-called "liberal" approach, which has been followed by the Fifth, Seventh, and Ninth Circuits. The justifications these courts have given for enjoining foreign court proceedings include: (i) to prevent an "absurd duplication of effort [that] would result in unwarranted inconvenience, expense, and vexation," *Kaepa*, 76 F.3d. at 627; (ii) to avoid "a duplication of the parties and the issues," *Philips*, 8 F.3d at 605; (iii) to prevent the frustration of a policy of the forum issuing the injunction, *Seattle Totems Hockey Club, Inc. v. Nat'l Hockey League*, 652 F.2d 852, 855 (9th Cir. 1981); (iv) to prevent vexatious or oppressive litigation, *id.*; (v) to protect against a threat to the issuing court's in rem or quasi in rem jurisdiction, *id.*; and (vi) to protect the moving party from undue prejudice, *id.* (holding that "allowing simultaneous prosecution of the same action in a foreign forum thousands of miles away would result in 'inequitable hardship' and 'tend to frustrate and delay the speedy and efficient determination of the case'"). While the liberal approach considers international comity, the First Circuit has observed that the courts employing this approach "tend to define that interest in a relatively narrow manner and to assign it only modest weight." *Quaak*, 361 F.3d at 17; *see, e.g.*, *Kaepa*, 76 F.3d at 627 (noting that an international anti-suit injunction does not "actually threaten relations" between the two involved nations).

{22}    TCG Partners advocates for the alternative "conservative" approach, which has been adopted by the District of Columbia, First, Second, Third, and Sixth Circuits.[3] The D.C. Circuit has described this approach as follows:

> [P]arallel proceedings on the same in personam claim should ordinarily be allowed to proceed simultaneously, at least until a judgment is reached in one which can be pled as res judicata in the other. The mere filing of a suit in one forum does not cut off the preexisting right of an independent forum to regulate matters subject to its prescriptive jurisdiction. For this reason, injunctions restraining litigants from proceeding in courts of independent countries are rarely issued.

*Laker Airways*, 731 F.2d at 926–27. This approach contemplates two justifications for a court to enjoin litigants from proceeding in a foreign country: (1) to protect the jurisdiction of the enjoining court, or (2) to avoid evasion of important public policies of the enjoining court. *Id.* at 927. The First Circuit has concluded that this approach is "more respectful of principles of international comity" and carries a "recognition that international comity is a fundamental principle deserving of substantial deference." *Quaak*, 361 F.3d at 18.

{23}    Under either approach, it seems clear that the D.C. Circuit's admonition in *Laker Airways* is correct: "[t]here are no precise rules governing the appropriateness of anti-suit injunctions. The equitable circumstances surrounding each request for an injunction must be carefully examined to determine whether . . . the injunction is required to prevent an irreparable miscarriage of justice." *Laker Airways*, 731 F.2d at 926–27.

{24}    After carefully considering the circumstances here, the Court is of the view that issuance of an anti-suit injunction is not appropriate under either the liberal or the conservative approach.

---

[3] The Fourth Circuit has not yet chosen between these two approaches; indeed, it appears only one federal district court within the Fourth Circuit has considered the appropriate standard to apply. *See Umbro Int'l, Inc. v. Japan Prof'l Football League*, No. 6:97-2366-13, 1997 U.S. Dist. LEXIS 24371, at *5 (D.S.C. Oct. 2, 1997) (noting that "[t]he Fourth Circuit has not addressed the precise legal standard to be employed in determining whether the issuance of an [international] antisuit injunction is proper" and finding an international anti-suit injunction appropriate under either approach).

{25}   First, of the various considerations justifying an anti-suit injunction under the liberal approach, the only one present here is to avoid the duplication of issues in concurrent proceedings. Indeed, it appears beyond dispute that the English Action, which seeks to recover the amounts O'Brien allegedly owes on the Note, is substantially similar to O'Brien's tenth cause of action, which seeks a declaration that O'Brien owes nothing on the Note. The mere duplication of issues, however, without more, does not convince the Court of the need for an injunction to prevent an irreparable miscarriage of justice, or to prevent the pursuit of vexatious or oppressive litigation, particularly in light of the "presumption in favor of concurrent jurisdiction." *Quaak*, 361 F.3d at 16–17; *see, e.g.*, *Golden Rule Ins. Co. v. Harper*, 925 S.W.2d 649, 651–52 (Tex. 1996) ("[I]f the principle of comity is to have any application, a single parallel proceeding . . . cannot justify issuing an anti-suit injunction. Such a suit must be allowed to proceed absent some other circumstances which render an injunction necessary to prevent an irreparable miscarriage of justice. Merely because the suits present identical issues does not make their proceeding an irreparable miscarriage of justice.").

{26}   Similarly, the Court finds no support for an injunction under the conservative approach. For example, unlike in *Staton*, there is no evidence that prosecution of the English Action threatens the jurisdiction of this Court over issues that affect the rights of parties that are not represented in the English Action. *See Staton*, 151 N.C. App. at 10, 565 S.E.2d at 109. This action does not involve any specific property located in North Carolina such that the English Action would delay or interfere with adjudication of any rights affecting such property. *See id.* at 11, 565 S.E.2d at 109 ("When a suit deals with specific property, a court is authorized to enjoin a party from bringing a new action in another court where that other action has the potential to delay or interfere with adjudication of rights affecting such property."). Unlike in *Kaepa*, there is no evidence of "cynicism, harassment, [or] delay" on the part of TCG Partners. *Kaepa*, 76 F.3d at 628. Indeed, unlike in *Wright* or *Staton*, TCG Partners did not file its English Action long after O'Brien filed his action in this Court; rather, TCG Partners filed its action just a few days after the

Complaint in this action was filed and only after TCG Partners provided warning of its intention to file suit prior to O'Brien filing his Complaint in North Carolina. *See Wright*, 156 F. at 245; *Staton*, 151 N.C. App. at 5. Moreover, there is no evidence that TCG Partners is attempting to escape the application of a North Carolina public policy, or that continuation of the English Action would threaten such a policy. *See Seattle Totems Hockey Club*, 652 F.2d at 855; *Laker Airways*, 731 F.2d at 932.

{27} In contrast, O'Brien, the defendant in the English Action, is a citizen and resident of England, and it appears TCG Partners elected to file suit in England—where O'Brien resides and where his assets are located—to aid its execution and collection efforts in the event TCG Partners is successful in obtaining a judgment against O'Brien on the Note. Although the Court is sympathetic that O'Brien may incur additional expense in litigating these two actions simultaneously, the Court does not find that the additional expense should cause the Court to deviate from the general rule of international comity that, absent some "irreparable miscarriage of justice," courts should be hesitant to enjoin a party from proceeding in an international forum.

{28} In sum, the Court concludes that O'Brien has failed to show that he will suffer irreparable harm unless the anti-suit injunction he seeks is issued. Accordingly, the Court concludes that O'Brien's Motion should be denied. *See Szymczyk v. Signs Now Corp.*, 168 N.C. App. 182, 189, 606 S.E.2d 728, 734 (2005) (holding, in the context of two state lawsuits, that plaintiff failed to show irreparable harm warranting the grant of an antisuit injunction).

IV.

CONCLUSION

{29} Based on the foregoing, the Court hereby **DENIES** O'Brien's Motion.

**SO ORDERED**, this the 23rd day of March, 2016.


/s/ Louis A. Bledsoe, III
Louis A. Bledsoe, III
Special Superior Court Judge
 for Complex Business Cases